DOOLEY ROBERTS & FOWLER LLP
865 S. Marine Drive
Suite 201, Orlean Pacific Plaza
Tamuning, Guam 96913
Telephone:    (671) 646-1222
Facsimile:    (671) 646-1223

Attorneys for Plaintiff Occidental Life
Insurance Company of North Carolina

FILED
DISTRICT COURT OF GUAM

SEP 2 0 2004

MARY L. M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF GUAM

| | | |
|---|---|---|
| OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA, | ) ) ) | CIVIL ACTION NO. **04-00041** |
| Plaintiff, | ) ) | |
| vs. | ) ) | **COMPLAINT** |
| NETCOR, INC. HOLDING COMPANY, | ) ) ) | |
| Defendant. | ) | |

**COMES NOW** OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA,

(hereinafter referred to as *"Complainant"* or *"OLIC")* and for its Complaint against NETCOR, INC.

HOLDING COMPANY (hereinafter referred to as *"NetCor"),* alleges the following :

## I.

## PARTIES

1.      Complainant is a Texas corporation with its principal office located in Waco,

McLennan County, Texas

2.      NetCor is a corporation organized and existing under the laws of Guam, with its

principal offices located at Suite 107, Julale Center, 424 West O'Brien Drive, Hagåtña, Guam 96910.

ORIGINAL

## II.

### JURISDICTION AND VENUE

3.      This Court has jurisdiction under United States Code, Title 28, Section 1332(a), (28 U.S.C.A. §§ 1332(a)), in that the matter in controversy is between a citizen of Texas and subjects of Guam, and the amount in controversy, exclusive of interest and costs, is well in excess of the minimum jurisdictional amounts of this Court.

4.      Venue properly lies in this district pursuant to 48 U.S.C. §1421i(h).

## III.

### FACTUAL ALLEGATIONS
### APPLICABLE TO ALL CAUSES OF ACTION

5.      Kurt S. Moylan and Kaleo S. Moylan (hereinafter collectively referred to as "the Moylans"), residents of Guam, as principals, own and control Moylan's Insurance Underwriters, Inc., a Guam corporation, which as agent, solicited life and health insurance applications from persons in Guam and Micronesia for OLIC.

6.      In 1997, the Moylans entered into discussions with OLIC concerning the sale by OLIC to the Moylans of a certain group of life and health insurance policies primarily insuring persons in Guam and Micronesia.

7.      Said policies were insured on applications solicited by Moylan's Insurance Underwriters.

8.      OLIC and the Moylans reached an agreement to transfer said policies.

9.      Under the terms of the agreement, the Moylans formed NetCor and the group of life and health insurance policies were transferred by OLIC to a wholly owned subsidiary of NetCor, Netcare Life and Health Insurance Company. In consideration for transfer of the policies to the

2

wholly owned subsidiary of NetCor, NetCor issued 20,000 shares of its Class A preferred stock to OLIC.

10.    Said agreement was memorialized in the following documents:

A.    Contract for Sale and Transfer of Insurance Portfolio entered into between OLIC, NetCor and its wholly owned subsidiary dated December 31, 1998;

B.    Agreement for Transfer and Assumption of Insurance Portfolio between OLIC and the wholly owned subsidiary dated July 15, 1988;

C.    Amendment No. 1 to Agreement for Transfer and Assumption of Insurance Portfolio dated September 15, 1998 and July 15, 1998, respectively.

D.    Amendment No. 2 to the Agreement For Transfer and Assumption of Insurance Portfolio, dated November 30, 1998;

E.    Stock Certificate No. 1, issued by NetCor dated December 31, 1998;

F.    Subscription Agreement;

G.    Closing Memorandum between OLIC, NetCor and the wholly owned subsidiary dated December 31, 1998;

H.    Articles of Incorporation of NetCor, and all amendments thereto;

I.    Transfer Agreement dated December 4, 1997 between OLIC and the Moylans;

J.    Transfer Agreement dated February 25, 1997 between NetCor, the Moylans and OLIC;

K.    Five Year Business Plan dated July 15, 1998 prepared by the wholly owned subsidiary of NetCor.

3

Said documents are attached hereto as Exhibits "A " through "K", respectively, and made a part hereof for all purposes, and collectively called the "Agreements."

11.     In accordance with the Agreements, the preferred stock of NetCor, which was issued to OLIC, was to pay cash dividends at the rate of $6.00 per share, per annum, payable quarterly on March 31, June 30, September 30 and December 31 of each year. The Articles of Incorporation of NetCor, as amended, further provided for the redemption of the Class A preferred stock at $100.00 per share in accordance with the following schedule: 1) 5,000 shares on or before July 1, 2001; 2) 10,000 shares on or before July 1, 2002; 3) the balance of any shares outstanding on or before September 30, 2003.

12.     Dividends were timely paid by NetCor to OLIC on the stock up until those dividends due and payable on September 30, 2003.  The September 30, 2003 dividends due and owing to OLIC were not paid to OLIC, but were instead paid into the trust account of Ryan, Swanson & Cleveland, in Seattle, Washington.  A copy of the letter dated October 1, 2003 from Jeffrey A. Hansen, CFO of NetCor to Darla Schaffer, VP and Comptroller of OLIC is attached hereto as *Exhibit "L"* and made a part hereof for all purposes.

13.     Though demand for payment of the dividends has been made by OLIC, NetCor has wholly failed to pay the dividends due on September 30, 2003, December 31, 2003, March 30, 2004, and June 30, 2004.  The total amount of dividends due and owing to OLIC as of the date of filing of this Original Complaint is $120,000.00.

14.     Although demand has been made on NetCor to do so, NetCor further wholly failed to redeem the 20,000 shares of Class A preferred stock of NetCor issued to OLIC as is contemplated by the Agreements and required by the Articles of Incorporation of NetCor.

4

15.     NetCor has failed to explain to OLIC the reason for NetCor's failure to pay the dividends which are due to OLIC or for NetCor's failure to redeem the 20,000 shares of its Class A preferred stock on September 30, 2003 or earlier. The only attempted explanations which OLIC has received for NetCor's failure to comply with the terms of the Agreement and of its Articles of Incorporation are general and non-specific complaints which are set out in the letter from Jeffery A. Hansen, CFO of the wholly owned subsidiary, dated May 12, 2003, a copy of which is attached hereto as *Exhibit "M"* and made a part hereof for all purposes.

16.     Because of NetCor's failure to comply with the terms of the Agreements and of NetCor to follow the requirements of its Articles of Incorporation, OLIC has suffered injury.

## IV.

## BREACH OF CONTRACT

17.     OLIC has fully and completely complied with all obligations imposed on it under the Agreements.

18.     NetCor was required by the Agreements and by the Articles of Incorporation of NetCor's failure to pay dividends on the stock issued to OLIC; and to redeem the 20,000 shares of Class A preferred stock issued to OLIC on or before September 30, 2003.

19.     Although dividends are due and payable and demand has been timely and properly made by OLIC on NetCor for payment, NetCor has failed to pay the dividends due to OLIC.

20.     In addition, although demand has been made on NetCor to redeem the 20,000 shares of Class A preferred stock issued to OLIC as contemplated in the Agreements and as provided in the Articles of Incorporation of NetCor, NetCor has wholly failed to redeem the 20,000 shares of Class A preferred stock held by OLIC.

5

21.     As a result of its action, NetCor is in breach of its obligations under the Agreements and as set out in the Articles of Incorporation of NetCor and OLIC has been damaged thereby in the amount of $2,000,000.00, representing the redemption price of the 20,000 shares of Class A preferred stock of NetCor, plus an additional amount of $120,000.00, being the amount of the unpaid dividends owed to OLIC as of the date of filing of this Complaint.

## VI.

## ESTOPPEL

22.     OLIC has fully and completely complied with all obligations imposed on it by the Agreements, and in good faith, and, in reliance on the representations made by NetCor, on or about December 31, 1998, transferred the above-mentioned life and health insurance policies to the wholly owned subsidiary of NetCor as the consideration provided for in the Agreements.

23.     NetCor has had the use and benefit of the consideration transferred to the wholly owned subsidiary of NetCor by Complainant for over five (5) years.

24.     NetCor is estopped from making any objection to the consideration paid and from denying OLIC the benefit of the same bargain from which NetCor has benefited.

## VII.

## SPECIFIC PERFORMANCE

25.     OLIC, having complied with all the terms of the Agreements for the transfer of Insurance Portfolio, is entitled to a decree of specific performance requiring NetCor to redeem the 20,000 shares of NetCor preferred stock held by OLIC, as provided for in NetCor's Articles of Incorporation, as amended.

6

## VIII.

## ATTORNEYS FEES

26.     It has been necessary for OLIC to secure the services of DOOLEY ROBERTS &
FOWLER LLP, attorneys and counselors at law, for the preparation and prosecution of this claim
against NetCor.

27.     Pursuant to the terms of the Contract for Sale and Transfer of Insurance Portfolio,
if there is a dispute between the parties concerning the Agreements, reasonable attorneys' fees
will be awarded to the prevailing party.

28.     Petitioner is entitled to an award of reasonable attorneys fees for the preparation
and prosecution of this claim.

## IX.

## PRAYER FOR RELIEF REQUESTED

WHEREFORE, OLIC requests that upon final hearing hereof, this Court issue judgment
in favor of OLIC against NetCor for:

1.     Actual damages in the amount of not less than $2,120,000.00, plus future dividends
which accrue after the date of filing of this Original Complaint, with interest from September 30,
2003 at the maximum rate allowed by law, compounded as allowed by law;

2.     For an order specifically enforcing the terms of the Agreements;

3.     Reasonable and necessary attorneys' fees incurred by Complainant in the
preparation and prosecution of this action, with interest at the maximum rate allowed by law until
paid;

4.     Costs of suit; and

7

5. For such other and further relief, general or special, at law or in equity to which OLIC may show itself justly entitled.

DOOLEY ROBERTS & FOWLER LLP

Dated: September 7, 2004

By: _____
DAVID W. DOOLEY
Attorneys for Plaintiff Occidental Life
Insurance Company of North Carolina

# CONTRACT FOR SALE AND TRANSFER OF INSURANCE PORTFOLIO

## RECITALS

1. On February 25, 1998, NetCor Inc. Holding Company (hereinafter "NetCor Inc."), a Guam Corporation, and Occidental Life Insurance Company of North Carolina (hereinafter "OLIC"), a Texas life insurance corporation, entered into a Transfer Agreement (hereinafter "Agreement"), attached hereto as Exhibit A and made part of this Closing Contract by reference, which provided for the purchase by and transfer to a life insurance company to be formed by NetCor Inc. of all of OLIC's book of insurance business in Guam and Micronesia.

2. On April 2, 1998, NetCare Life and Health Insurance Company (hereinafter "NLHIC") received its Certificate of Authority to do business on Guam as an insurer from the Insurance Commissioner of Guam.

3. On April 31, 1998, NetCor Inc. assigned the Agreement to NLHIC in exchange for shares of Common Stock and made a capital cash contribution to NLHIC. This Assignment is attached hereto as Exhibit B and made a part of this Closing Contract by reference.

4. On July 15, 1998, NLHIC and OLIC entered into the Agreement for the Transfer and Assumption of Insurance Portfolio (hereinafter "Transfer Agreement), attached hereto as Exhibit C and incorporated into this Contract by reference. This Transfer Agreement was subsequently amended on September 15, 1998, by Amendment No. 1 to the Transfer Agreement, and again on November 30,

EXHIBIT A

1998, by Amendment No. 2 to the Transfer Agreement. Amendment Nos. 1 and 2
are attached hereto as Exhibit D and incorporated into this Contract by reference.

     5.    NLHIC shall be referred to herein as "BUYER", and OLIC shall be
referred to herein as "SELLER".

Therefore, in accordance with the provisions of the Transfer Agreement and
Amendment No. 1 thereto, BUYER and SELLER agree as follows:

**FIRST:**    BUYER and SELLER enter into this Contract, the purpose of which
is to benefit both parties by providing SELLER with reinsurance
coverage on its transferred policies and by permitting BUYER to
assume and take over coverage of those policies of SELLER which
shall be transferred to BUYER on December 31, 1998, 1:59 p.m.
Under this Agreement, SELLER exclusively gives BUYER the right
to offer renewal terms on the existing policies of SELLER under
the same terms and conditions as the policyholders' policies.

**SECOND:**    SELLER, in order to fulfill the terms and conditions of the above-
mentioned TRANSFER AGREEMENT, does hereby sell, convey,
assign and deliver to the BUYER, the following:

(1)   <u>Policies</u>.

All policies of insurance related to Life and Health heretofore
issued   or   assumed   by   SELLER,   including   all   riders   and

endorsements thereto, through its branch offices in the Territory of Guam, the Commonwealth of the Northern Mariana Islands, the Republic of Belau, the Federated States of Micronesia and the Marshall Islands (hereinafter called the SUBJECT AREA), to individuals currently residing in SUBJECT AREA which will be in force at or within the grace period as of the date hereof (hereinafter referred to as the "Policies").

"Policies" as used herein, includes any policies issued by SELLER between the Reference Date, as defined in the TRANSFER AGREEMENT, and the date hereof in the SUBJECT AREA and excludes any policies which terminated or lapsed prior to the date hereof (unless reinstated by NLHIC after the date hereof) or for which the policyholder has not given his consent to the assumption effectively under the Notice of Transfer. BUYER shall have the absolute right to reinstate any such lapsed policies after the date of this Contract.

(2)    Assets.

In addition to the Policies, SELLER agrees to transfer to BUYER all assets related to the assumed policies, including

statutory reserves, premium deposit funds, advance premiums and

policy loans (hereinafter referred to as the "Assets").

(3)   Exclusions.

However, policies issued by SELLER covering United States

Military employees and their families are excluded from the

TRANSFER AGREEMENT and this Contract for Sale and Transfer

of Insurance Portfolio.

THIRD:   BUYER accepts the transfer made herein, and assumes, as of this

date, the policies and liability for all claims and demands against

the policies as provided under the Transfer Agreement.

FOURTH:   Notwithstanding any provision to the contrary in the TRANSFER

AGREEMENT, the closing of this sale shall take place

simultaneously at locations to be determined by the parties in

Raleigh, North Carolina, and at 101 Agana Shopping Center,

Agana, Guam, at 1:59 p.m., official Guam time on December 31,

1998, and at whatever that moment in time and date is in Raleigh,

North Carolina ("Closing Date").

FIFTH:   Payment by BUYER to SELLER of the purchase price shall be made

on the Closing Date according to the terms of the Subscription

Agreement (attached hereto as "Exhibit E") which shall be

concurrently entered into on December 31, 1998, by BUYER'S parent company, NETCOR, INC., and SELLER, as agreed in the AGREEMENT entered into between SELLER and NETCOR INC. on February 25, 1998.

The purchase price referred to above shall be determined using numbers calculated as of the Reference Date and therefore shall be adjusted pursuant to the provisions of Article VII of the TRANSFER AGREEMENT and Amendment No. 2 to the TRANSFER AGREEMENT.

SIXTH: The BUYER does hereby agree to:

(1) Assume the related risks of the Assumed Policies and the payment of any indemnification, in case of loss.

(2) Guarantee the insured or policyholders the same rights contained in their contracted policies. This guarantee applies to the insured or policyholders subject to the payment of the premiums and compliance with its obligations under the policy.

(3) Comply with all the obligations derived from this Contract and the TRANSFER AGREEMENT, and any Amendments thereto as agreed to by the parties.

**SEVENTH:** Except as otherwise provided under this Contract all provisions of the TRANSFER AGREEMENT and Amendments are part of this Contract and remain in full force and effect. The parties agree that this Contract with any complimentary documents and exhibits, as well as the TRANSFER AGREEMENT and any document signed by the duly appointed representatives of the parties to complement this Contract constitutes the sole covenant of the parties hereto and supersedes any prior understanding or written or oral agreements between the parties in relation to the within subject matter.

**EIGHTH:** The parties agree to the terms and conditions of this Contract and the TRANSFER AGREEMENT and any amendments thereto agreed to by the parties.

**NINTH:** In the event either party to this Contract shall employ legal counsel to protect its rights under this Contract or to enforce any term or provision of this Contract, then the party prevailing in such legal action shall have the right to recover from the other party all of its reasonable attorney's fees, costs and expenses incurred in relation to such claim.

**TENTH:** The terms and conditions of this Contract shall extend to and inure to the benefit of and be binding on the respective successor and assigns of the parties hereto.

EXECUTED this 31st day of December 31, 1998.

**NETCARE LIFE AND HEALTH INSURANCE COMPANY, a subsidiary of NETCOR INC. HOLDING COMPANY**

By_____
KURT S. MOYLAN
Title: President
Address:
101 Agana Shopping Center
Agana, Guam 96910

**OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA**

By_____
JAMES WOODRUFF LILLIE, JR.
Title: Chairman
Address:
2610 Wycliff Road
Raleigh, North Carolina 27607-3070

**ACKNOWLEDGED AND AGREED: NETCOR INC. HOLDING COMPANY**

By_____
KURT S. MOYLAN
Title: President

D98846.MTC

# AGREEMENT FOR TRANSFER AND ASSUMPTION
## OF INSURANCE PORTFOLIO

This Agreement For Transfer and Assumption of Insurance Portfolio ("Agreement") executed and delivered as of the 15th day of July, 1998 by and between, OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA, a Texas life insurance corporation, with its principal place of business at 2610 Wycliff Road, Raleigh, North Carolina ("OLIC"), and NETCARE LIFE AND HEALTH INSURANCE COMPANY, with its principal place of business and home office at 101 Agana Shopping Center, Agana, Guam 96910 ("NLHIC").

WHEREAS, OLIC is in the business of underwriting life and health insurance and NLHIC desires to assume certain policies of insurance (life and health) issued by OLIC;

WHEREAS, pursuant to the terms of that certain Transfer Agreement dated February 25, 1998 ("the Transfer Agreement"), between OLIC and NetCor Incorporated ("NetCor") which is the parent company of NLHIC, OLIC and NLHIC have agreed that OLIC and NLHIC shall enter into this Agreement;

NOW, THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

I

## POLICIES

(A)    OLIC promises to transfer and cede on the Closing Date (hereinafter defined) to NLHIC, and NLHIC promises to reinsure on an assumption reinsurance basis on the Closing Date the following portfolio of insurance:

(1)    All life and health insurance policies issued by OLIC in Guam, the Commonwealth of the Northern Mariana Islands "CNMI" the Federated States of Micronesia, the Marshall Islands, the Republic of Belau or Micronesia ("Subject Area"), which as of the Closing Date are in force, owned by policyholders residing in the Subject Area, and covering insureds residing in the Subject Area, together with policies issued by OLIC between the Reference Date and the Closing Date in the Subject Area (the "Policy Pool") and excluding any policies (i) which terminated or lapsed prior to the Closing Date (unless reinstated by NLHIC after the Closing Date) or (ii) for which the policyholder has not given his/her consent to the



EXHIBIT B

assumption of his/her policy by NLHIC effectively under all applicable terms of the Notice of Transfer attached hereto as Exhibit A (all of said policies with such referred to as "Assumed Policies"). The policies to be Assumed Policies are identified in a Policy List pursuant to (B) below (the "Policy List"); and

(2)     All assets (the "Assets") related to the Assumed Policies, in an amount equal to statutory reserves held and accounted for by OLIC as OLIC certified by OLIC's Chief Actuary to be in substantial conformity with applicable NAIC guidelines and regulations of the Department of Insurance of the State of Texas.

(B)     Concurrently with the execution and delivery of this Agreement, OLIC shall provide NLHIC with a Policy List that is initialed as agreed to between the parties and includes the following information on the policies that are intended to be transferred: policy number, name of insured, age issued, date issued, type of policy, amount of coverage, premium, statutory reserves, and the corresponding total accumulated fund values. By the signing of this Agreement, NLHIC hereby confirms and acknowledges by its own due diligence with the full cooperation of OLIC, the material accuracy of the information contained in the Policy List.

(C)     For all purposes of this Agreement, the Reference Date shall be September 30, 1997.

For all purposes of this Agreement, Closing and the Closing Date are defined in Article III hereafter.

(D)     As a material inducement to enter into this Agreement, OLIC represents and warrants to NLHIC as follows:

(1)     That all the Assumed Policies which are subject to this Agreement are and will be validly issued on forms which materially comply with the laws and the rules and regulations of the appropriate regulatory authority and are in force.

(2)     That to the knowledge of OLIC, none of the policyholders, insureds, or beneficiaries of the Assumed Policies have any claim or cause of action against OLIC as a result of the application for or issuance of such Assumed Policies or for any other reason except such rights as may be specifically expressed in the written policy contract;

(3) That no person, firm or corporation has any claim or lien on the Assumed Policies or their premium, except OLIC, and except for:

    (a) policy Loans;

    (b) assignments of benefits on cash values or policy proceeds by policy owners;

    (c) reinsurance contracts certified copies of each of which are attached hereto as exhibits; and

(4) That OLIC is not aware of any fact or condition which materially impairs or diminishes the value of the Assumed Policies or Assets transferred hereby.

(E) OLIC is required by law to file with the Department of Insurance of the State of Texas information regarding material transactions and reserves the right to file a copy of this Agreement together with such information.

II

ASSUMPTION

(A) NLHIC shall at its own cost and expense cause to be mailed or delivered to each policyholder in the Subject Area a Notice of Transfer in the form attached hereto as Exhibit A. Responses received (or not received) from such policyholders will determine whether their Policies will be assumed by NLHIC.

(B) For all holders of Policies for which an affirmative consent in writing was not given by the policyholder in response to the Notice of Transfer, notwithstanding said consent shall have been given as a matter of law, NLHIC shall obtain some form of writing evidencing said consent and failing same, shall, for a period of one year following the Closing, hold OLIC harmless from any loss resulting from a claim under such policy enforced against OLIC by said holder or the relevant Department of Insurance.

C) Subject to the conditions of Article III below, for all Assumed Policies, NLHIC shall be deemed to have acquired and assumptively reinsured the Assumed Policies and NLHIC shall thereafter be directly responsible to the owners, insureds and beneficiaries for all of OLIC's obligations and liabilities under the Assumed Policies as if NLHIC had issued the Assumed Policies.

D) NLHIC shall at its own cost and expense cause to be mailed or delivered to the owner of each Assumed Policy, a Certificate of Assumption acknowledging the transfer and assumption by NLHIC of such Assumed Policy obligations.

## III

## CLOSING

(A)  The consummation of the promises hereby agreed and the rights and obligations of each party accruing under this Agreement are subject to:

(1)  The Closing taking place on September 30, 1998, or such earlier date as the parties may agree provided such latter date is not sooner than forty-five (45) days after the date of the Notice of Transfer; and

(2)  Compliance with the applicable laws of the regulatory authorities of the State of Texas, Guam and CNMI; and

(B)  The Closing of this transaction shall take place at the office of NLHIC in 101 Agana Shopping Center, Agana, Guam, or such other place as agreed to by the parties. The Closing will be effective as of 11:59 p.m. EDT in New York, New York on the Closing Date.

(C)  At the Closing both parties shall execute all documents reasonably necessary to effectuate the transfer and assumption of the Assumed Policies and Assets, and shall proceed as follows:

(1)  OLIC and NLHIC shall sign and execute a Closing Contract in substantially the form attached as Exhibit C, assigning the Assumed Policies and Assets.

(2)  NetCor shall deliver to OLIC the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D.

(3)  NLHIC shall receive and assume the Assumed Policies and shall assume their related fund values and reserves.

(4)  OLIC shall pay to NLHIC in legal tender of the United States of America, in immediately available funds, amounts previously agreed as representing 100% of the statutory reserves held and accounted for by OLIC for the Assumed Policies deducting therefrom the following:

(i)  Previously identified deferred premium assets on the Assumed Policies; and

(ii)  The amount of loans made to policyholders by OLIC.

Such amounts have been calculated using numbers calculated as of the Reference Date according to the Policy List and therefore shall ,be adjusted pursuant to Article VII ("Adjustments").

(5)     OLIC shall return any amounts not expended from the expense deposit advanced by NetCor under the Transfer Agreement.

(6)     NLHIC shall pay to OLIC the sum of $121,402.00 in full reimbursement of funds paid to International Marketing Corporation ("IMC") as the present value of all commissions due on renewal premiums for Assumed Policies against delivery to NLHIC of a release form IMC from any liabilities with respect to Assumed Policies.

(7)     Premiums due but not yet received on Assumed Policies shall be adjusted in favor of OLIC under Article VII below.

IV

DELIVERY OF POLICIES

NLHIC will be entitled to all original policy files which shall include the original records and reports pertaining to or used in connection with the Assumed Policies as of the Closing Date.  OLIC will deliver to NLHIC, at its offices, all such documents upon request in a reasonable period of time.  OLIC will be entitled to retain copies of such records and reports, including but not limited to the following:

(A)     The application for each of the Assumed Policies;

(B)     All underwriting reports, medical examination reports, microfilm records and claim files;

(C)     All documents, files and records pertaining to the Assumed Policies; and

(D)     All compatible electronic data related to the Assumed Policies.

V

APPROVAL AND EXPENSES OF TRANSFER

(A)     The execution hereof by OLIC and NLHIC has been authorized by their respective Boards of Directors or committees thereof, by persons with full authority to act therefore and  to enter into this Agreement, the Closing Contract and the purchase and sale of the Assumed Policies and Assets. OLIC and NLHIC deliver herewith, a certified copy of a resolution of its Board of Directors authorizing this transaction and authorizing

appropriate officers to act on its behalf. Copies of these resolutions are attached as Exhibits E and F.

(B)   NLHIC and OLIC shall have the obligation, at their respective cost and expense, to seek and obtain from the appropriate agency having jurisdiction over insurance matters (OLIC in Texas and NLHIC in Guam and the CNMI), any required approval of this transaction. Both parties hereby agree to fully cooperate with the other in obtaining the approval of such governmental agencies.

## VI

## CONDUCT OF BUSINESS BEFORE AND AFTER CLOSING

(A)   As to the Assumed Policies, NLHIC assumes responsibility for all life and disability claims incurred after the Closing Date and OLIC remains liable for all life claims incurred through the Closing Date and disability benefits payable through the Closing Date whether or not reported at the Closing Date. A claim for a death benefit will be deemed to have been incurred at the time of death. NLHIC assumes responsibility for all other health claims incurred after the Closing Date and OLIC remains liable to NLHIC for all such health claims incurred through the Closing Date provided that such claims are reported at the Closing Date. NLHIC assumes responsibility for all health claims incurred on or before the Closing Date provided that such claims were not reported at the Closing Date.

For any claim liabilities of OLIC hereunder, OLIC shall have all defenses and rights available under the terms of the Assumed Policies. NLHIC shall notify OLIC of any such claims as soon as reasonably possible. OLIC shall pay NLHIC any such claims due but NLHIC shall reimburse OLIC for any related claim or other reserve amounts previously transferred and any deferred premium received regarding such claim. In such case, as to policies assumed as of the Closing, NLHIC shall receive an adjustment credit pursuant to Article VII (A) for any such Assumed Policies that lapse or terminate on or before the Closing .

(B)   After the Closing Date, NLHIC shall conduct and manage all administrative services and responsibilities regarding the Assumed Policies consistent with generally acknowledged industry practices as necessary and appropriate to the Assumed Policies including, but not limited to, all policyholder servicing, claims, accounting, reinsurance reporting, regulatory compliance, and record keeping responsibilities.

(C)   With respect to the Assumed Policies, NLHIC hereby agrees to assume the payment of all regular agents' or brokers' commissions and other sales commissions earned after the Closing Date. OLIC represents and warrants that all of such regular agents' or brokers' commissions arise only from the Assumed Policies transferred to NLHIC. However, NLHIC will not assume OLIC's agency contracts with its agents and

brokers and OLIC will hold NLHIC harmless of all liabilities related to such contracts except for commissions earned after the Closing Date. NLHIC is also not assuming any liabilities, commissions, or payments earned prior to the Closing Date or labor costs of any nature.

(D)     NLHIC acquires as of the Closing Date all rights derived from Assumed Policies and is authorized to make any defense at law or in equity to any action or claim made under any Assumed Policies purchased under this Agreement, which defense could have been made by OLIC had this Agreement not been executed; and, all the provisions, limitations and conditions contained in the Assumed Policies shall remain in effect and be applicable in accordance with the terms of such Assumed Policies as issued by OLIC. OLIC hereby agrees to fully cooperate with NLHIC at NLHIC's expense, to uphold NLHIC's rights under this provision, including but not limited to, the appointments of attorneys designated by NLHIC.

(E)     As of the Closing Date, NLHIC shall maintain all legal reserves with respect to the Assumed Policies in accordance with all applicable regulatory requirements.

VII

ADJUSTMENTS

The amounts paid at Closing shall be adjusted as soon as practicable, but no later than forty five (45) days, after the Closing Date. For all purposes of this Agreement, this date shall be called the Adjustment Date. Any adjustments at the Adjustment Date shall be as follows:

(A)     The difference between (i) the life insurance total face amount of the Policies from a base amount of Three Hundred Two Million Dollars ($302,000,000.00) as expressed in the Policy List as of the Reference Date and (ii) the life insurance total face amount of the Policy Pool as of the Closing, shall be multiplied by a factor of Five Dollars and Eighty Cents ($5.80) per thousand dollars of such difference and the result, if positive, shall be an adjustment credit due NLHIC under this Paragraph (A). The adjustment credit due NLHIC under this Paragraph (A) shall be payable solely from dividends declared on and paid to OLIC on the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D. OLIC shall pay or offset all of such dividends to NLHIC within ten (10) days after receipt of same, as such dividends may be paid from time to time and without regard to any interest, until the adjustment credit due NLHIC under this Paragraph (A) has been extinguished.

(B)     Any changes occurring between the Reference Date and the Closing Date in the net calculation of deferred premiums, policy loans, and statutory reserves as to the Assumed Policies found in Article III(C)(4) above, shall be calculated and the resulting net amounts, if less at Closing than at Reference Date will be credited and paid to OLIC

and if more at Closing than at Reference Date will be credited and paid to NLHIC. The resulting amount of this calculation shall be paid on the Adjustment Date to OLIC or to NLHIC, as the case may be, in United States currency in the form of a cashier's check to the party entitled to receive such funds.

(C)     Any other reimbursements, costs or expenses, returns, charges hereby agreed by the parties, if any, shall be settled at that time.

(D)     There shall be no adjustments made because of policies having been added or policies lapsed in the ordinary course of business or reserves having increased or decreased in the normal course of business since the Closing Date.

## VIII

## ARBITRATION

(A)     In the event of differences arising between the parties to this Agreement with reference to any transactions under this Agreement, such differences must be submitted to arbitration upon the request of one of the parties according, to the laws of Guam applicable to arbitration.

Within thirty (30) days after such request, each of the two parties shall nominate one arbitrator. In the event that either party fails to appoint its arbitrator within the time specified, the Administrator of the American Arbitration Association ("AAA") in Honolulu, Hawaii, shall have the right to appoint the said arbitrator forthwith. The two named arbitrators shall elect an umpire before entering upon the arbitration. The said arbitrators and umpire shall be officers of any insurance or reinsurance companies not under the control or management of any party to this Agreement and not a resident of Guam, Texas or North Carolina. The umpire shall be selected by the arbitrators, but if the arbitrators do not agree as to any umpire within ten (10) days of their appointment, then the umpire will be selected by the arbitrators from a list of persons provided by each party. If the arbitrators cannot agree to the selection of an umpire from the lists, then the Administrator of the AAA in Honolulu, Hawaii shall select the umpire from the lists exchanged between the parties.

(B)     The arbitration shall be held in the State of Hawaii. Each party shall submit its case to the Board of Arbitration (two arbitrators and one umpire) within fifteen (15) days of the appointment of the umpire or within such period as may be agreed by the Board of Arbitration. The terms and Provisions of this Agreement and the essence of this Agreement shall be the guidelines for the arbitrators and they shall seek to enforce its terms and intent in good faith.

(C)     A decision in writing by any two of the three members of the Board of Arbitration, shall be binding upon both parties. Each party shall pay the fee of their own arbitrator. All other costs of the umpire and the AAA shall be equally divided between

the parties. A judgment upon the decision of total Board of Arbitration may be entered in any court of competent jurisdiction and may be enforced in any such court.

(D)     As required under Guam law, both OLIC and NLHIC are represented by legal counsel who have reviewed this Agreement, including this arbitration provision, and approve the legal form of this Agreement by their signatures below.

## IX

## REINSURANCE

NLHIC takes and assumes Policies under this Agreement subject to the reinsurance on the Assumed Policies placed in force by OLIC. NLHIC shall have the option of obtaining its own reinsurance upon payment to OLIC of recapture fees required by the in-place reinsurers.

## X

## BROKER FEES

Except for the brokerage relationship previously disclosed to NLHIC and which brokerage obligation shall in no event be a cost or expense of NLHIC, OLIC has not retained or incurred any obligation for any investment banker, broker or finder in connection with the Documents to which it is a party. NLHIC has not retained or incurred any obligations for any investment banker, broker or finder in connection with the Documents to which it is a party.

## XI

## OTHER TERMS AND CONDITIONS

(A)     All of the representations, warranties, covenants and agreements of the parties, as well as any rights and benefits of the parties, shall survive the Closing and shall not be merged therein.

(B)     This Agreement may not be assigned by either party without the express written consent of the other party.

(C)     This Agreement and the future Closing Contract shall be binding upon and inure to the benefit of the parties hereto and their respective assigns and successors, where permitted by this Contract.

(D)     This Agreement and the Closing Contract with their complementary documents and exhibits, constitutes the sole covenant of the parties hereto and supersedes

any prior understanding or written or oral agreements between the parties in relation to the within subject matter. There are no other understandings between the parties with respect to the Assumed Policies and any modification to this Agreement must be in writing and executed by both parties.

(E)     OLIC shall give to NLHIC, its counsel, accountants, agents or representatives, reasonable access during normal business hours up to the Adjustment Date and at any time subsequent to the signing hereof to all of OLIC's properties, books, contracts, policies, records related to the Assumed Policies, and furnish NLHIC with all information concerning OLIC, related to the Assumed Policies which NLHIC reasonably may request and allow inspections, reproduction and copying of same. Any expense as a result of such NLHIC's request will be the sole obligation of NLHIC.

(F)     Any and all notices required to be sent pursuant to the terms of this Agreement shall be at the address set forth under the signature of each such party hereto, unless either party notifies the other of a new address.

(G)     Subsequent to the Closing Date, NLHIC shall indemnify and hold harmless OLIC against any and all claims on the terms of the Assumed Policy contracts, all agents commissions which NLHIC assumes herein, all liabilities, obligations or other claims, as well as all actions, suits, proceedings, demands, assessments, judgments, costs and expenses incident to any of the Assumed Policies transferred herein, except:

> (1)     Liability assumed by OLIC herein; or
>
> (2)     Such liability as may have arisen as a result of any misrepresentation, fraud, conversion, breach of fiduciary duty, or negligence of OLIC or its agents.

Such indemnity shall also include, but not be limited to, all attorney's fees, interest, costs and other legal expenses incurred by OLIC in this regard.

(H)     Representations and Warranties by NLHIC.

NLHIC represents and warrants as follows:

> (1)     NLHIC has, and at the Closing Date will have, the legal power and financial ability to enter into and consummate this Agreement.
>
> (2)     NLHIC, at the Closing Date, is incorporated, authorized, qualified and licensed under any and all applicable laws, regulations, ordinances, or other rules of public authorities, to carry on the business of life and health insurance in Guam and the CNMI, as an insurance company which company is known as NLHIC and such company at the Closing Date will not be in material violation of

any such applicable laws, regulations, ordinances, or rules, but in substantial compliance therewith and is qualified under all applicable laws, rules and regulations, related to the Assumed Policies and necessary for the assumption of the Assumed Policies pursuant to this Agreement.

(3) NLHIC will perform. and carry out and cause to be performed and carried out, all acts to be done by it under this Agreement, before and after Closing.

(I) Representations and Warranties by OLIC.

OLIC represents and warrants as follows:

(1) OLIC has, and at the Closing Date will have, the legal power and financial ability to enter into and consummate this Agreement.

(2) OLIC, at the Closing Date, is incorporated, authorized, qualified and licensed under any and all applicable laws, regulations, ordinances, or other rules of public authorities, to carry on the business of life and health insurance in Texas, as an insurance company which company is known as OLIC and such company at the Closing Date will not be in material violation of any such applicable laws, regulations, ordinances, or rules, but in substantial compliance therewith and is qualified under all applicable laws, rules and regulations, related to the Assumed Policies and necessary for the transfer of the Assumed Policies pursuant to this Agreement.

(3) OLIC will perform and carry, out and cause to be performed and carried out, all acts to be done by it under this Agreement, before and after Closing.

(4) OLIC agrees, for a period of five (5) years counted as of this date, that it will not in any manner attempt to directly compete in the Subject Area in the same lines of business (individual life, disability, accident, and health insurance) as those assumed by NLHIC nor do any of the following acts:

(a) Solicit or rewrite any of the Assumed Policies;

(b) Employ, appoint or offer to employ or appoint any of the agents receiving commissions on the Assumed Policies;

(c)    Solicit any of the policyholders of the Assumed Policies for the purchase of insurance;

(d)    Release the names of the insureds of the Assumed Policies to any one other than NLHIC except for appropriate regulatory authorities, or as may otherwise be required by law.

Notwithstanding the above, nothing herein shall restrict or preclude OLIC from maintaining or servicing its policies that are not assumed by NLHIC nor shall it restrict or preclude OLIC's affiliates from pursuing their current business interests in the Subject Area nor shall it restrict or preclude OLIC or its affiliates from acquiring, or being acquired by, a United States or international insurer that does business in the Subject Area. In such event, OLIC shall agree not to use or allow any affiliate to use any data or information related to the Assumed Policies.

(J)    Conditions Precedent, to be fulfilled by NLHIC.

The obligations of OLIC to complete the transactions provided for herein shall be subject, at its choice, to the performance by NLHIC of all obligations to be performed by it hereunder, on or before the Closing Date and in addition thereto, the following further conditions:

(1)    All representations and warranties of NLHIC contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as though made at the Closing Date; and

(2)    Compliance with requirements of the appropriate supervisory authorities in Texas, Guam and the CNMI to be shown by opinion of counsel.

At the option of OLIC, any conditions precedent to be fulfilled by NLHIC may be waived by OLIC.

K)    Conditions Precedent to be fulfilled by OLIC.

The obligations of NLHIC to complete the transactions provided for herein shall be subject, at its election, to the performance by OLIC of all obligations to be performed by it hereunder, on or before the Closing Date and in addition thereto, the following further conditions:

(1)    All representations and warranties of OLIC contained in this Agreement shall be true and correct in all material respects on and as of the Closing, Date in all respects as though made on and as of the Closing Date; and

(2)    Compliance with requirements of the laws and the rules and regulations of the Department of Insurance, State of Texas be shown by opinion of counsel

At the option of NLHIC, any conditions precedent to be fulfilled by OLIC may be waived by NLHIC.

(L)    OLIC covenants to NLHIC that between the date hereof and the Closing Date, OLIC will continue to administer and service the portfolio of Assumed Policies in its normal and established manner and will maintain its records and accounting books in the manner which fairly and accurately reflects the income, expenses, assets and liabilities, regarding the assets hereby transferred in accordance with applicable general accounting and insurance principles.

(M)    After the Closing, OLIC will forward to NLHIC as soon as possible all premiums, claims and other correspondence, if any, received by OLIC in connection with the Assumed Policies.

(N)    Errors and Omissions

NLHIC and OLIC will cooperate in good faith and will not without good cause make claims for non-material and unintentional delays, errors or omissions made by the other party in connection with this Agreement and the Closing agreement, provided such delays, errors or omissions are rectified as soon as possible after discovery.

(0)    OLIC will fully cooperate with NLHIC by endorsing or transferring promptly any payments received regarding the Assumed Policies and promoting with the policyholders of the Assumed Policies that payments be made directly to NLHIC.

(P)    OLIC and NLHIC shall cooperate and hold harmless each other from any claim received by either one from any other person if, according to this Agreement, the other party is responsible for such claim. The parties agree to give each other notice of any such claim as soon as reasonably possible.

(Q)    OLIC agrees to allow NLHIC to adopt and use the formats of any and all applications and policies of OLIC.

(R)    NLHIC or OLIC shall have the right to withdraw from the Agreement in the event that approval of the transfer of the policies is required but cannot be obtained from the jurisdictions of Guam and the State of Texas.

(S)    If after the Closing OLIC decides to withdraw from the transaction of insurance in Guam or the CNMI, NLHIC agrees to cooperate in such withdrawal as OLIC's reinsurer by the execution of such documents as may be reasonably necessary.

(T)   This Agreement shall be deemed to have been made and shall be interpreted and construed pursuant to the laws of Guam.  Both parties hereby designate the Guam Commissioner of Insurance as their agent for service of process for any action hereunder. The courts of Guam shall have jurisdiction over the parties in any action at law relating to the subject matter of the interpretation of the contract, and the parties agree to comply with all requirements necessary to give such court jurisdiction and to abide by the final decision of such court or any Appellate Court in the event of appeal.  This provision, however, is not intended to conflict with or override the obligation of the parties to arbitrate their disputes in accordance with Article VIII.


**OCCIDENTAL LIFE INSURANCE
OF NORTH CAROLINA**
2610 Wycliff Road
Raleigh, NC  27607

By:  William R. Ealy

_____
President

Approved  to Form:

By_____
    Attorney of OLIC


**NETCARE LIFE AND HEALTH
INSURANCE COMPANY**
101 Agana Shopping Center
Agana, Guam 96910

By:  Kaleo S. Moylan

_____
~~Chairman~~  EVP

By_____
    Attorney for NHLIC



## NetCare
Life & Health Insurance

NOTICE OF TRANSFER

# IMPORTANT: THIS NOTICE AFFECTS YOUR CONTRACT RIGHTS. PLEASE READ IT CAREFULLY

### Transfer of Policy

Occidental Life Insurance Company of North Carolina ("Occidental") is discontinuing its operations in Guam, the Commonwealth of the Northern Mariana Islands and Micronesia. In order to provide for the proper maintenance of our policy obligations and the continuing servicing of our policyholders, Occidental has entered into an agreement to transfer on September 30, 1998 its entire portfolio of business in Guam, the Commonwealth of the Northern Mariana Islands, Republic of Palau, Republic of Marshall Islands, and Federated States of Micronesia to a new Guam domestic insurer, NetCare Life and Health Insurance Company ("NetCare"). The Insurance Commissioner for both Guam and the Commonwealth of the Northern Mariana Islands have been advised of this transaction.

### Your Rights

You have the right to accept or reject the transfer of your policy to NetCare. You can do this by checking the appropriate box, signing and returning the enclosed pre-addressed, postage prepaid card addressed to Moylan's Insurance Underwriter's Inc., which are general agents for both Occidental and NetCare.

If you reject the transfer, you may keep your policy with Occidental. Whether or not you accept or reject the transfer you may exercise any option under your policy. If Moylan's Insurance Underwriter's have not received a written rejection from you within 45 days from the date of this Notice, August 1, 1998, you will, as matter of law, have consented to the transfer, and NetCare will be your insurer as of October 1, 1998.

### Effect of Transfer

All the reserves required by law to be maintained to service claims under the policies being transferred, and the assets underlying those reserves, will be transferred from Occidental to NetCare at the close of business on September 30, 1998 pursuant to the agreement between Occidental and NetCare to transfer this portfolio of business.

---

FROM _____

_____

( ) Check here if this is a new address

NO POSTAGE
NECESSARY
IF MAILED
IN THE
UNITED STATES

# BUSINESS REPLY MAIL
FIRST-CLASS MAIL    PERMIT NO. 14    BARRIGADA GU

POSTAGE WILL BE PAID BY ADDRESSEE

MOYLAN'S INSURANCE UNDERWRITERS INC
AGANA SHOPPING CENTER
302 S ROUTE 4 STE 101
AGANA GU 96910-9998



# NetCare
Life & Health Insurance

If you do not reject this transfer, NetCare will be your insurer as of October 1, 1998; and NetCare will have direct responsibility to you from that date for the payment of all claims benefits and for all other policy obligations. Occidental will no longer have any obligations to you.

Until further notice you should continue to make all premium payments as you are now, and claims submissions as you would now. We will provide you with new instructions as we get closer to the October 1, 1998 date.

Enclosed is a pro forma balance sheet of NetCare the way it would look on October 1, 1998 and after giving effect to the Transfer, assuming all the policies in Guam, the Commonwealth of the Northern Mariana Islands, Republic of Palau, Republic of Marshall Islands, and Federated States of Micronesia and the reserves set aside backing those policies, are transferred from Occidental to NetCare as planned.

You may obtain additional information concerning NetCare as well as further clarification of your rights under your policy by contacting Moylan's Insurance, which company will represent NetCare in the Pacific and continue to assist Occidental in servicing any policies which are not transferred. Therefore, if you have any questions about the terms of this transfer we encourage you to contact Moylan's Insurance Underwriters, Inc., NetCare or Occidental in each case at the appropriate address below.

**For your convenience, we have enclosed a pre-addressed, postage-paid response card.**
**Please take time now to read the enclosed notice, complete and return the response card to us through**
Moylan's Insurance Underwriters.

Sincerely,

Kurt Moylan
Chairman
NetCare Life and Health
Insurance Company

William Ealy
President
Occidental Life Insurance Company
of North Carolina

| | | |
|---|---|---|
| Occidental Life Insurance Company of North Carolina **Administrative Office** 2610 Wycliff Road Raleigh, NC USA 27607 Attention: Judy Haney, Vice President Telephone: (919) 786-8276 | Moylan's Insurance Underwriters **Local and Home Office** 101 Agana Shopping Center Agana, Guam 96910 Telephone: (671) 477-8613/16 (671) 477-7500 | NetCare Life and Health Insurance Company **Local and Home Office** 705 South Marine Drive Tamuning, Guam 96911 Attention: Kaleo Moylan, Vice President Telephone: (671) 649-5387/8/9 (671) 649-5390/1 |

5/98

## RESPONSE CARD

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

_____ Yes. I accept the transfer of my policy from Occidental Life of North Carolina to NetCare Life and Health Insurance Company.

_____ No. I reject the proposed transfer of my policy from Occidental Life of North Carolina to NetCare Life and Health Insurance Company and wish to retain my policy with Occidental Life Insurance Company of North Carolina.

Date: _____

Signature: _____

Name: _____

Street Address: _____

City, State, Zip: _____

Policy Number: _____

# AMENDMENT NO. 1 TO
## AGREEMENT FOR TRANSFER AND ASSUMPTION
## OF INSURANCE PORTFOLIO
## (THE "AGREEMENT")

This Agreement No. 1 to the Agreement is entered into as of the 15th day of September, 1998 between the parties to the Agreement executed on July 15, 1998. All capitalized terms used herein and not defined herein shall have the meanings set forth in the Agreement.

I.      Article III of the Agreement is hereby amended to read in its entirety as follows:

### III

### CLOSING

(A)     The consummation of the promises hereby agreed and the rights and obligations of each party accruing under this Agreement are subject to:

      (1)     The Closing taking place on January 1, 1999 Guam time; and

      (2)     Compliance with the applicable laws of the regulatory authorities of the State of Texas, Guam and CNMI; and

(B)     The Closing of this transaction shall take place simultaneously at locations to be determined by the parties in Raleigh, North Carolina and at 101 Agana Shopping Center, Agana, Guam, at 11:59 p.m. official Guam time on January 1, 1999, and at whatever that moment in time and date is in Raleigh by EDT..

(C)     At the Closing both parties shall deliver all executed documents reasonably necessary of effectuate the transfer and assumption of the Assumed Policies and Assets, and shall proceed as follows:

EXHIBIT _C_

**AMENDMENT NO. 1 TO AGREEMENT FOR TRANSFER
AND ASSUMPTION OF INSURANCE PORTFOLIO (THE "AGREEMENT")**

(1)    OLIC and NLHIC shall deliver a signed Closing Contract in substantially the form attached as Exhibit C, assigning the Assumed Policies and Assets.

(2)    NetCor shall deliver to OLIC's representatives the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D.

(3)    NLHIC shall receive and assume the Assumed Policies and shall assume their related fund values and reserves.

(4)    OLIC shall transfer to a bank in Guam on or before December 27, 1998, cash amounts previously agreed as representing 100% of the statutory reserves held and accounted for by OLIC for the Assumed Policies, deducting therefrom the following:

    (i)    Previously identified deferred premium assets on the Assumed Policies; and

    (ii)    The amount of loans made to policyholders by OLIC. These amounts shall then be paid in immediately available funds at Closing to NLHIC in Guam. (Such amounts have been calculated using numbers calculated as of the Reference Date according to the Policy List and therefore shall be adjusted pursuant to Article VII ("Adjustments").

2

**AMENDMENT NO. 1 TO AGREEMENT FOR TRANSFER
AND ASSUMPTION OF INSURANCE PORTFOLIO (THE "AGREEMENT")**

    (5)    OLIC shall also return by check delivered at Closing in Guam any amounts not expended from the expense deposit advanced by NetCor Inc. under the Transfer Agreement executed by NetCor Inc. and OLIC on February 25, 1998.

    (6)    NLHIC shall pay to OLIC by check delivered at Closing in Raleigh, North Carolina, the sum of $121,402.00 in full reimbursement of funds paid to International Marketing Corporation ("IMC") as the present value of all commissions due on renewal premiums for Assumed Policies against delivery to NLHIC of a release form IMC from any liabilities with respect to Assumed Policies.

    (7)    Premiums due but not yet received on Assumed Policies shall be adjusted in favor of OLIC under Article VII below.

II.    Paragraph (A) of Article VII is hereby amended to read in its entirety as follows:

    (A)    The difference between (i) the life insurance total face amount of the Policies from a base amount of Three Hundred Two Million Dollars ($302,000,000.00) as expressed in the Policy List as of the Reference Date and (ii) the life insurance total face amount of the Policy Pool as of the Closing, shall be multiplied by a factor of Five Dollars and Eighty Cents ($5.80) per thousand dollars of such difference and the result, if positive, shall be an adjustment credit due NLHIC

3

under this Paragraph (A). The adjustment credit due NLHIC under this Paragraph (A) shall be payable in the first instance from dividends declared on and paid to OLIC on the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D. OLIC shall pay or offset all of such dividends to NLHIC within ten (10) days after receipt of same, as such dividends may be paid from time to time and without regard to any interest, until the adjustment credit due NLHIC under this Paragraph (A) has been extinguished. In the event the amount of such dividends is insufficient to extinguish said adjustment credit, then in order to make up the shortfall, OLIC will surrender to NLHIC a sufficient number of shares of NetCor Inc. Preferred Stock at par value received by OLIC under the terms of the Subscription Agreement.

IN WITNESS WHEREOF, the undersigned duly qualified and authorized officers of each of the parties set their hand and the seals of their corporation as of the day and month herein first above stated.

OCCIDENTAL LIFE INSURANCE
COMPANY OF NORTH CAROLINA

By _____
WILLIAM R. EALY
President

CO98866.MTC

NETCARE LIFE AND HEALTH
INSURANCE COMPANY

By _____
KURT S. MOYLAN
President

4

# AMENDMENT NO. 2 TO
## AGREEMENT FOR TRANSFER AND ASSUMPTION
## OF INSURANCE PORTFOLIO
## (THE "TRANSFER AGREEMENT")

This Amendment No. 2 to the Transfer Agreement is entered into as of the 30th day of November, 1998, between the parties to the Transfer Agreement. All capitalized terms used herein and not defined herein shall have the meanings set forth in the Transfer Agreement.

I.     Article III of the Transfer Agreement is hereby amended to read in its entirety as follows:

### III

### CLOSING

(A)     The consummation of the promises hereby agreed and the rights and obligations of each party accruing under this Transfer Agreement are subject to:

(1)     The Closing taking place on December 31, 1998, 1:59 p.m., Guam Time; and

(2)     Compliance with the applicable laws of the regulatory authorities of the State of Texas, Guam and CNMI; and

(B)     The Closing of this transaction shall take place simultaneously at locations to be determined by the parties in Raleigh, North Carolina and at 101 Agana Shopping Center, Agana, Guam, at 1:59 p.m. official Guam Time on December 31, 1998, and at



EXHIBIT _____ D _____

whatever that moment in time and date is in Raleigh, North Carolina, by Eastern Standard Time (EST).

(C)     At the Closing both parties shall deliver all executed documents reasonably necessary to effectuate the transfer and assumption of the Assumed Policies and Assets, and shall proceed as follows:

(1)     OLIC and NLHIC shall deliver a signed Closing Contract in substantially the form attached as Exhibit C, assigning the Assumed Policies and Assets.

(2)     NetCor shall deliver to OLIC's representatives the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D.

(3)     NLHIC shall receive and assume the Assumed Policies and shall assume their related fund values and reserves.

(4)     OLIC will transfer to a bank or any other account designated by NLHIC on or before December 27, 1998, cash amounts previously agreed as representing 100% of the statutory reserves held and accounted for by OLIC as of September 30, 1998, for the Assumed Policies, deducting therefrom the following:

2

       (i)      Previously identified deferred premium assets on the Assumed Policies; and

       (ii)     The amount of loans made to policyholders by OLIC.

These amounts shall then be paid in immediately available funds at Closing to NLHIC or its order. (Such amounts have been calculated using numbers calculated as of September 30, 1998, and therefore shall be adjusted pursuant to Article VII ("Adjustments")).

       (5)     OLIC has returned by check delivered at Closing in Guam amounts not expended from the expense deposit advanced by NetCor Inc. under the Transfer Agreement executed by NetCor Inc. and OLIC on February 25, 1998, and assigned by NetCor Inc. to NLHIC on April 31, 1998.

       (6)     NLHIC shall pay to OLIC by cashier's check delivered at Closing in Raleigh, the sum of $121,402.00 in full reimbursement of funds paid to International Marketing Corporation ("IMC") as the present value of all commissions due on renewal premiums for Assumed Policies against delivery to NLHIC of a release from IMC from any liabilities with respect to Assumed Policies.

       (7)     Premiums due but not yet received on Assumed Policies shall be adjusted in favor of OLIC under Article VII below.

3

II.     Article VII is hereby amended to read in its entirety as follows:

The amounts paid at Closing shall be adjusted as soon as practicable, but no later than sixty (60) days, after the Closing Date.   For all purposes of this Transfer Agreement, this date shall be called the Adjustment Date.   Any adjustments at the Adjustment Date shall be as follows:

(A)     The difference between (i) the life insurance total face amount of the Policies from a base amount of Three Hundred Two Million Dollars ($302,000,000.00) as expressed in the Policy List as of the Reference Date and (ii) the life insurance total face amount of the Policy Pool as of the Closing, shall be multiplied by a factor of Five Dollars and Eighty Cents ($5.80) per thousand dollars of such difference and the result, if positive, shall be an adjustment credit due NLHIC under this Paragraph (A).   The adjustment credit due NLHIC under this Paragraph (A) shall be payable in the first instance from dividends declared on and paid to OLIC on the preferred stock as described in the Subscription Agreement attached hereto as Exhibit D.   OLIC shall pay or offset all of such dividends to NLHIC within ten (10) days after receipt of same, as such dividends may be paid from time to time and without regard to any interest, until the adjustment credit due NLHIC under this Paragraph (A) has been extinguished.   In the

4

event the amount of such dividends is insufficient to extinguish said adjustment credit, OLIC will surrender a sufficient number of shares of NetCor Inc. Preferred Stock at par value, to make up the shortfall.

(B)   Any changes occurring between September 30, 1998, and the Closing Date in the net calculation of deferred premiums, policy loans, and statutory reserves as to the Assumed Policies found in Article III(C)(4) above, shall be calculated and the resulting net amounts, if less at Closing than on September 30, 1998, will be credited and paid to OLIC and if more at Closing than on September 30, 1998, will be credited and paid to NLHIC. The resulting amount of this calculation shall be paid on the Adjustment Date to OLIC or to NLHIC, as the case may be, in United States currency in the form of a cashier's check to the party entitled to receive such funds.

(C)   Any other reimbursements, costs or expenses, returns, charges hereby agreed by the parties, if any, shall be settled on the Adjustment Date.

(D)   There shall be no adjustments made because of policies having been added or policies lapsed in the ordinary course of business or reserves having increased or decreased in the normal course of business since the Closing Date.

5

**AMENDMENT NO. 2 TO AGREEMENT FOR TRANSFER**
**AND ASSUMPTION OF INSURANCE PORTFOLIO (THE "TRANSFER AGREEMENT")**

IN WITNESS WHEREOF, the undersigned duly qualified and authorized officers of each of the parties set their hand and the seals of their corporation as of the day and month herein first above stated.

**OCCIDENTAL LIFE INSURANCE**
**COMPANY OF NORTH CAROLINA**

By _____
    JAMES W. LILLIE, JR.
    Chairman

**NETCARE LIFE AND HEALTH**
**INSURANCE COMPANY**

By _____
    KURT S. MOYLAN
    President



**This Certifies that** Occidental Life Insurance Company *is the owner of* _____ *Shares of the* Twenty Thousand (20,000) Preferred Capital Stock of Net Cor Inc. Holding Company *transferable only upon the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.*

*In Witness Whereof, the said Corporation has caused this certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation this _____ day of _____ A.D. 19___*

EXHIBIT E

*For Value Received,* _____ *hereby sell, assign, and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

_____ *Shares*
*represented by the within Certificate, and do hereby*
*irrevocably constitute and appoint*
_____ *Attorney*
*to transfer the said Shares on the books of the within named*
*Corporation with full power of substitution, in the premises.*
*Dated* _____ *19* ____

*In presence of*

NOTICE THE SIGNATURE OF THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

## STATEMENT OF SECRETARY

The rights and obligations of the holders of the Class A Preferred Stock are defined in the Articles of Incorporation of NetCor Inc. Holding Company, as amended, a certified true and correct copy of which is appended to this certificate and made a part thereof by reference.

Dated: December 31, 1998

**MIKI MOYLAN**
Secretary

CO988115.MTC

## SUBSCRIPTION AGREEMENT
### December 31, 1998

The undersigned **OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA** ("OLIC") agrees to take and **NETCOR INC. HOLDING COMPANY** ("NHC"), an insurance holding company organized under the laws of Guam, agrees to issue to OLIC, twenty thousand (20,000) shares of Preferred Stock (the "Stock") of NHC. A certified copy of the Articles of Incorporation (containing all provisions and amendments relating thereto) is attached hereto as Exhibit A, on the terms and provisions hereinafter set forth.

1.     Consideration for issuance of the Stock is the contemporaneous transfer and assignment by OLIC of certain portions of OLIC's portfolio of insurance to NetCare Life and Health Insurance Company ("NLHIC"), a life and health insurance company, which is wholly-owned subsidiary of NHC, pursuant to that certain Agreement for Transfer and Assumption of Insurance Portfolio (the "Agreement") dated as of the date hereof between OLIC and NLHIC on the Closing Date (the "Closing") all as specified in the Agreement.

2.     OLIC represents and warrants to NHC and NLHIC that it is purchasing the Stock for investment and not with a view to sale, provided that the Stock purchased by OLIC shall remain at all times within its control, and provided further that nothing herein shall limit OLIC's general ability to manage its assets in accordance with all applicable insurance investment laws or to transfer the Stock as part of a corporate restructuring.

3.     NHC represents and warrants that the shares of Stock will have been duly and validly authorized and issued and will constitute in OLIC's hands, as issued pursuant to the terms of the Agreement, fully paid and non-assessable shares of Preferred Stock of NHC.

4.     NHC and NLHIC on the one hand, and OLIC on the other hand, agree that any Adjustment requiring, by the terms of Article VII of the Agreement, a reduction in the amounts due under the Agreement by NLHIC to OLIC shall be paid by OLIC from funds constituting, or offset against initial payment(s) of dividends on the Stock.

5.     OLIC shall not receive title to the Stock hereunder and OLIC shall not be entitled to dividends or other benefits of the Stock hereunder, unless and until:



EXHIBIT F

(a)   OLIC and NLHIC execute the Closing Contract on the Closing Date, referred to in the Agreement; and

(b)   All conditions of Closing have been concurrently satisfied.

Executed and delivered as of the day and year first above written.

**OCCIDENTAL LIFE**
**INSURANCE COMPANY**
**OF NORTH CAROLINA**


By _____
JAMES W. LILLIE, JR.
Chairman

**NETCOR INC. HOLDING**
**COMPANY**


By _____
KURT S. MOYLAN
Its Chairman


**ACKNOWLEDGED AND CONFIRMED:**

**NETCARE LIFE AND HEALTH**
**INSURANCE COMPANY**


By _____
Chairman

CO98892.MTC

2

## CLOSING MEMORANDUM

### December 31, 1998

For the Transfer and Assumption of the Portfolio of Insurance Policies Issued by

**OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA** ("OLIC")

throughout the Island of Guam, the Commonwealth of the Northern Mariana Islands, the

Federated States of Micronesia, the Marshall Islands, and the Republic of Micronesia.

### RECITALS

I.   A simultaneous closing took place in Raleigh, North Carolina, and Agana, Guam,

at 1:59 p.m. official Guam time December 31, 1998. Such time and date (which

also took place effective at that same moment in time (Eastern Standard Time) in

Raleigh, North Carolina on December 31, 1998) is hereinafter referred to as the

Closing Date. All capitalized terms used herein except as otherwise defined are as

defined in the Agreement for Transfer and Assumption of Insurance Policies ("the

Transfer Agreement"), dated July 15, 1998, as amended.

II.  Prior to Closing the parties or persons related have:

A.   Executed and delivered a Transfer Agreement ("the Agreement") dated

February 25, 1998, between NetCor Inc. Holding Company ("NetCor Inc.")

and OLIC providing for the purchase of the Guam/Pacific book of business.

B.   Moylan's Insurance Underwriters ("Moylan's") has made capital

contributions to NetCor Inc.

**EXHIBIT** $\underline{G}$

C.  NetCor Inc. assigned the Transfer Agreement to NetCare Life and Health Insurance Company ("NLHIC") in exchange for shares of Common Stock and made a capital contribution in cash to NLHIC.

D.  NLHIC and OLIC entered into the Transfer Agreement for transfer of the portfolio of Assumed Policies.

E.  OLIC and Moylan's collaborated with PacWest, Inc., a Delaware corporation, to purchase the administration system of Digital Systems and convert the Assumed Policies from Life 70 to the new system for the benefit of NLHIC. This conversion was completed on December 31, 1998.

F.  OLIC informed the Department of Insurance of the State of Texas of the Transfer and Assumption on ~~December~~ *November 13*, 1998.

III.  At the Closing on the Closing Date, OLIC and NLHIC signed and executed and delivered each to the other a Closing Contract evidencing transfer of the Assumed Policies and the Assets related thereto pursuant to the Agreement for Transfer and Assumption namely:

A.  Payment by OLIC to NLHIC of cash funds in U.S. dollars which was an amount equal to the statutory reserves held and accounted for by OLIC on the Assumed Policies, less amounts equal to:

1.  Deferred premium assets on the Assumed Policies, and

2.      Policy loans made by OLIC to the policyholders on the Assumed
        Policies.

B.      Delivery of a certificate signed by OLIC's Chief Actuary that the statutory
        reserves held and accounted for by OLIC on the Assumed Policies were in
        substantial conformity with applicable NAIC guidelines and regulations of
        the Department of Insurance of the State of Texas.

C.      Delivery by NLHIC to OLIC of $2.0 million stated value of Preferred Stock
        in NetCor Inc., the parent Company of NLHIC, in payment for the transfer
        of the business represented by the Assumed Policies.

D.      NLHIC acknowledged and assumed liability under each of the Assumed
        Policies and recorded on their books the statutory reserves and fund values
        related thereto.

E.      OLIC returned Nineteen Thousand Three Hundred Ninety-Eight Dollars and
        Thirty-One Cents ($19,398.31) of the Fifty Thousand Dollars ($50,000.00)
        expense deposit made on behalf of NetCor Inc. and not expended by OLIC
        under the terms of the Agreement of February 25, 1998.

F.      NLHIC paid to OLIC the cash sum of One Hundred Twenty-One Thousand
        Four Hundred Two Dollars ($121,402.00) in reimbursement of funds
        previously paid to International Marketing Corporation ("IMC") as the

present value of commissions due on renewal premiums for Assumed
Policies.

G.   OLIC and NLHIC will exchange reciprocal receipts of the various items
being transferred by each to the other and OLIC will confirm that it will
hold NLHIC harmless of liabilities related to agency contracts on
commissions except for commissions earned after the Closing Date.

**Note:** The funds transferred by OLIC to NLHIC and reconciliation of premiums due but
not yet received on Assumed Policies are subject to adjustment under the terms of the
Transfer Agreement and Amendments entered into between the parties.

IV.   Post Closing.

The following are expected to take place after the Closing Date.

A.   Adjustments made pursuant to Article VII of the Transfer Agreement.

B.   Notice of Instruction to each of the holders of Assumed Policies to pay their
premiums and refer their questions directly to NLHIC as previously set out
in the Notice of Transfer mailed to each policyholder.

C.   NLHIC will enter into a third party administration agreement on December
31, 1998, with PacWest, Inc. to administer the OLIC Portfolio for a
definitive period.

D.  OLIC will deliver to NLHIC original policy files for all the Assumed Policies including original applications, underwriting reports, medical reports, all records pertaining to the policies and electronic data relating to the policies.

E.  NLHIC shall maintain legal reserves with respect to the Assumed Policies in accordance with applicable regulatory requirements.

**Agreed and Approved By:**

**NETCARE LIFE AND HEALTH INSURANCE COMPANY, a subsidiary of NETCOR INC. HOLDING COMPANY**

By _____
    KURT S. MOYLAN
    Title: President
    Address:
    101 Agana Shopping Center
    Agana, Guam 96910

**OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA**

By _____
    JAMES WOODRUFF LILLIE, JR.
    Title: Chairman
    Address:
    2610 Wycliff Road
    Raleigh, North Carolina 27607-3070

**NETCOR INC. HOLDING COMPANY**

By _____
    KURT S. MOYLAN
    Title: President

CO98893.MTC

RECEIVED

DEC 1 5 1997

DEP'T. �match V. & TAX
GOV'T OF GUAM
BLR 01

## ARTICLES OF INCORPORATION

### OF

### NETCOR INC. HOLDING COMPANY

### A Guam Corporation

TO ALL TO WHOM THESE PRESENTS MAY COME, GREETINGS:

KNOW YE, that we, the undersigned, desiring to become incorporated as a corporation under and in accordance with the laws of Guam, and to obtain the benefits conferred by said laws upon corporations, do hereby mutually agree upon and enter into the following Articles of Incorporation:

### ARTICLE ONE

The name of the corporation shall be:

### NetCor Inc. Holding Company

### ARTICLE TWO

The place of the principal office of the corporation shall be at 101 Agana Shopping Center, Agana, Guam, and there may be such subordinate or branch offices in such place or places within or without Guam as may be deemed necessary or requisite by the Board of Directors to transact the business of the corporation, such branch or subordinate offices to be in charge of such persons or person as may be appointed by the Board of Directors. The mailing address of the corporation shall be 101 Agana Shopping Center, Agana, Guam 96910.

### ARTICLE THREE

The nature of the business and of the purpose to be conducted and promoted by NetCor Inc. Holding Company, which shall be additional to the authority of the corporation to conduct any lawful business, to promote any lawful purpose and to engage in any lawful act or activity for which corporations may be organized under the General Corporation law of Guam, is as follows:

To subscribe or cause to be subscribed for and to purchase and otherwise acquire, sell, assign, transfer, mortgage, pledge,

EXHIBIT H

exchange, distribute and otherwise dispose of the whole or any part of the shares of the capital stock of any other corporation or corporations, association or associations engaged in any business of the kind here provided for now or existing in the future and whether created by the laws of Guam or of any other state, territory or government, and while the owner of the shares of capital stock to exercise all the rights, powers and privileges, of ownership of every kind, including the right to vote, with the power to designate some person or persons for that purpose from time to time to the same extent as natural persons might or could do, and to issue in respect of the same, either in its own name or in the joint names of itself and any other corporation or association, respectively, bearer certificates evidencing the rights in the holders in and to the whole or any part of the shares of capital stock as this corporation may desire to accord, reserve or convey to the holders of bearer certificates and to enter into any arrangement, contract, agreement or understanding with any other corporation or association, respectively, with respect to the purchase or other acquisition of the shares of capital stock, the issuance of the bearer certificates in respect of the same and the rights to be accorded, reserved or conveyed to the holders by this corporation.

To carry on and undertake any business undertaking, transaction or operation commonly carried on or undertaken by capitalists, promoters, financiers, concessionaires, contractors, brokers, and commission merchants and any other incidental business which may seem to the company convenient to carry on in connection with the above, or calculated directly or indirectly to enhance to the value of or render profitable any of the company's property or rights; provided that the same is not inconsistent with the laws of Guam.

To do everything necessary, proper, advisable, or convenient for the accomplishment of any of the purposes, or the

2

attainment of any of the objects, or the furtherance of any of the powers herein set forth, either alone or in association with others, and incidental or pertaining to, or growing out of, or connected with, its business or powers, provided the same be not inconsistent with the laws of Guam.

And, in furtherance of said purposes, the corporation shall also have the following powers, that is to say:

(a) To lend and advance money or to give credit, with or without security, to such persons, firms or corporations, and on such terms as may be thought fit; and if with security, then upon mortgages, deeds of trust, pledges, or other hypothecation or liens upon real, personal or mixed property, or any right or interest therein or thereto;

(b) To have succession by its corporate name;

(c) To sue and be sued in any court;

(d) To adopt and use a corporate seal, and alter the same at its pleasure;

(e) To appoint any such subordinate officers and agents as the business of the corporation shall require;

(f) To make and adopt and from time to time amend or repeal By-Laws not inconsistent with any existing law for the management of its operations and properties, the election and removal of its officers, the regulation of its affairs and the transfer of its stock and for all other purposes permitted by law;

(g) To purchase the business, goodwill and all other property of any individual, firm or corporation, as a going concern, and to assume all its debts, contracts and obligations, provided said business is incidental to the business of the corporation and as authorized by the powers herein contained;

(h) To borrow money or otherwise incur indebtedness (which may be in excess of its capital stock), with or without security and to secure any indebtedness by deed of trust, mortgage, pledge, hypothecation or other lien upon all or any part of the real or personal property of the corporation and to execute bonds, promissory notes, bills of exchange, debentures,

3

or other obligations or evidences of indebtedness of all kinds, whether secured or unsecured;

(i) To become a party to effect a merger or consolidation with another corporation or other corporations, and to enter into agreements and relationships not in contravention of the law with any person, firm or corporation;

(j) To become surety for or guarantee any dividends, bonds, stocks, contracts, debts or other obligations or undertakings of any other person, firm or corporation, and to convey, transfer or assign, by way of pledge or mortgage all or any of the corporation's property or rights, both present and future, to secure person, firm, or corporation and on such terms and conditions as the corporation may determine;

(k) To do all or any of the above things in any part of the world, directly or indirectly, and as principal, agent, factor, contractor, or otherwise, and by or through trustees, agents, or otherwise, and either alone or in conjunction with others.

The purposes specified herein shall be construed both as purposes and powers and shall be in nowise limited or restricted by reference to, or inference from the terms of any other clause and each of the clauses herein shall be regarded as independent purposes and powers, and the enumeration of specific purposes and powers shall not be construed to limit or restrict in any manner the meaning of general terms or of the general powers of the corporation; nor shall the expression of one thing be deemed to exclude another, although it be of like nature not expressed.

## ARTICLE FOUR

The authorized capital stock of the corporation shall be ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00) divided into ONE HUNDRED TEN (110) shares of common stock with the par value of TEN DOLLARS ($10.00) each share, all with equal voting rights, powers and privileges; and FOUR (4) shares of preferred stock with a par value of ONE HUNDRED DOLLARS ($100.00) per share. The initial issued capital stock of the corporation shall be ONE THOUSAND SIXTY DOLLARS ($1,060.00) divided into ONE HUNDRED SIX (106) shares of common stock with the par value of TEN DOLLARS ($10.00) each share, all with equal voting rights, powers and privileges. The Board of Directors is authorized to determine the consideration and the terms and conditions on which the remaining capital stock may be issued,

4

and what portion, if any, shall be paid-in surplus, subject to the laws of the Guam.

A statement of the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, in aspect of the Preferred Stock of the Corporation is as follows:

### A. **Dividends:**

(1) The holders of the Preferred Stock shall be entitled to receive, as and when declared by the Board of Directors out of funds of the Corporation legally available therefor, cash dividends at the rate of Six Dollars ($6.00) per share per annum, cumulative from the date of issuance thereof (computed on the basis of a 360-day year, 30-day month), payable quarterly on the last day of March, June, September and December in each year, to stockholders of record on such date, not exceeding 60 days preceding such dividend dates, as shall be fixed for the purpose by the Board of Directors in advance of payment of each particular dividend.

(2) So long as any shares of Preferred Stock are outstanding, no dividend shall be declared or paid or other distribution made on the Common stock nor shall the Corporation purchase or otherwise acquire, or permit an subsidiary of the Corporation to purchase or otherwise acquire, any shares of Common stock until all past quarterly dividend periods shall have been paid in full or declared in full and sums set apart for the payment thereof and there shall exist no default in the payment of any amount payable with respect to the redemption of any shares of Preferred Stock.

(3) The holders of the Preferred Stock shall not be entitled to receive any dividends thereon other than as cash dividends at the rate herein above provided. Arrears of dividends shall not bear interest.

(4) Subject to the foregoing provisions, the holders of the Common Stock shall be entitled to receive, as and when declared by the Board of Directors out of the remaining funds of the Corporation legally available therefor, such dividends (payable in cash, stock or otherwise) as the Board of Directors may from time to time determine, payable to stockholders of record on such dates, not exceeding 60 days preceding the dividend payment dates, as shall be fixed for the purpose by the Board of Directors in advance of payment of each particular dividend.

5

**B.   Liquidation:**

(1)   In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, then out of the assets of the corporation before any distribution or payment to the holders of the Common stock, the holders of the Preferred Stock shall be entitled to be paid the sum of One Hundred Dollars ($100) per share, together with full cumulative dividends accrued and unpaid to and including the date of such liquidation, dissolution or winding up, whether or not such dividends have been earned or declared; and the holders of the Preferred Stock shall be entitled to no other or further distribution.

(2)   After payment in full to the holders of the Preferred Stock of the sums which such holders are entitled to receive in such case, the remaining assets of the corporation shall be distributed among and paid to the holders of the Common stock ratably in proportion to the number of shares of Common stock held by them respectively.

(3)   If the assets of the corporation available for distribution to its stockholders shall be insufficient to permit payment in full to the holders of the Preferred Stock of the sums which such holders are entitled to receive in such case, then all of the assets available for distribution to the stockholders shall be distributed among and paid to the holders of the Preferred Stock ratably in proportion to the number of shares of Preferred Stock held by them respectively.

(4)   The consolidation or merger of the corporation with any other corporation or corporations shall not be deemed a liquidation, dissolution or winding up of the Corporation within the meaning of this paragraph, provided that such consolidation or merger (except in the case of a consolidation or merger with one or more wholly-owned subsidiaries of the Corporation) shall have been consented to by the holders of a majority of the shares of the Preferred Stock at the time outstanding in the manner provided in paragraph D(3), infra.

**C.   Redemption:**

(1)   The Preferred Stock shall be redeemed by the Corporation pursuant to the following schedule:

(i)     5,000 shares on or before July 1, 2000;

(ii)    10,000 shares on or before July 1, 2001;

6

(iii)    5,000 shares on or before July 1, 2002;

and is subject to redemption in whole but not in part at the option of the Board of Directors.  The price is One Hundred Dollars ($100) per share, together in every case with full cumulative dividends accrued and unpaid to and including the date fixed for such redemption, whether or not such dividends have been earned or declared.

(2)    The aggregate of the amounts payable upon the redemption of a share of any class of stock is hereinafter referred to as the "redemption price".

(3)    Notice of the intention of the Corporation to redeem shares of any class of stock which is subject to redemption of the date and place for redemption shall be mailed at least 30 and not more than 60 days prior to the date to be redeemed at his last known address as shown by the records of the Corporation, but no failure to mail such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption except as to the holder to whom the Corporation failed to mail such notice or whose notice was defective.  Any notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the holder receives such notice.

(4)    On and after the date of redemption designated in such notice, each holder of shares called for redemption, upon surrender to the Corporation at the place designated in such notice of the certificate or certificates for such shares, properly endorsed in blank for transfer in blank and bearing any necessary transfer tax stamps thereto affixed and canceled, shall thereupon be entitled to receive payment of the redemption price in cash.  In case less than all shares represented by such surrendered certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(5)    If such notice of redemption shall have been duly given, and if on or before the redemption date funds necessary for the redemption of the shares to be redeemed shall have been set aside so as to be and continue to be available therefor, then notwithstanding that any certificate representing any shares so called for redemption shall not have been surrendered, the dividends thereon shall cease to accrue from and after the date of redemption and all rights with respect to the shares so called for redemption shall forthwith after such redemption date cease, except only the right of the holder to receive the redemption price without interest.  Any moneys so set aside by the Corporation and unclaimed by the end of three

7

years from the date fixed for such redemption shall revert to the general funds of the Corporation.

(6)  All shares of the Preferred Stock redeemed or otherwise acquired by the Corporation shall be canceled and retired and shall not be reissued.

### D.  **Voting Rights**:

(1)  Each holder of shares of the Common Stock shall be entitled to one vote for each share standing in the name of such holder on the books of the Corporation,

(2)  At any time when the Corporation shall default in the payment of dividends on the Preferred Stock for two consecutive quarterly dividend periods; or when the Corporation shall default in the payment of any amount payable or when the Corporation shall default in the payment of any amount payable with respect to the redemption of any shares of Preferred Stock; or when the Corporation shall default in the payment of principal or interest on any obligation for borrowed money, or in the performance of any of the terms or any instrument evidencing or relating to such obligation, and such default shall continue for more than the period of grace, if any, specified therein; or if the corporation shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due or shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition of bankruptcy filed against the Corporation in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Corporation or of all or any substantial part of the properties of the corporation, or the Corporation or its directors or majority stockholders shall take any action looking to the dissolution or liquidation of the corporation; or if within 60 days after the commencement of an action against the corporation seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such action shall not have been dismissed or all orders or proceedings thereunder affecting the operations or the business of the Corporation stayed, or if the stay of any such order or proceeding shall thereafter be set aside, or if within 60 days after the appointment without the consent or acquiescence of

8

the Corporation of any trustee, receiver or liquidator of the
Corporation or of all or any substantial part of the properties
or if a Final Judgment shall be rendered against the
Corporation and if, within 60 days after entry thereof, such
judgment shall not have been discharged or execution thereof
stayed pending appeal; or if, within 60 days after the
expiration of any such stay, such judgment shall not have been
discharged; then and in every such event (hereinafter referred
to as an "Event of Default") the holders of the Preferred Stock
voting separately as a class shall be entitled to elect the
smallest number of directors of the Corporation which will be
at least a majority of the Board of directors, and the holders
of the Common Stock voting separately as a class shall be
entitled to elect the remaining directors of the Corporation.
However, if and when all Events of Default which may have
occurred shall thereafter be cured, the holders of the
Preferred Stock shall then be divested of such voting power,
and the Common Stock shall be entitled to elect all directors
of the corporation voting together as one class, but always
subject to the same provisions for the vesting of such voting
power in the Preferred Stock in the case of any future Event of
Default.  A special meeting of the Stockholders, at which the
holders of the Preferred Stock shall vote as a class and the
holders of the common Stock shall vote as a class, shall be
held within 10 days after the accrual of any such voting power,
and upon notice similar to that provided in the By-Laws of the
Corporation for stockholders meetings, upon call by the holders
of not less than 10% of the number of shares of the Preferred
stock at the time outstanding or at the request in writing of
the holders of not less than 5% of the number of shares of the
Preferred Stock at the time outstanding, addressed to the
Secretary of the Corporation at the principal business office
of the corporation, in which case such Secretary shall call
such meeting to be held.  The holders of the Preferred Stock
and the Common Stock, respectively, shall be entitled to
exercise such separate class voting power at a special meeting
of stockholders called as aforesaid and at the next and
succeeding annual meetings until termination of such separate
class voting power.  Whenever the right of the holders of the
Preferred Stock and Common Stock to elect directors by voting
as separate classes has arisen, the terms of office of all
persons who then may be directors of the corporation shall
terminate upon the election of their successors at a meeting of
the stockholders as above provided.  Upon termination of such
voting power at any time by reason of the curing of all Events
of Default, the terms of office of all persons who may have
been elected directors of the Corporation by vote of the
holders of the Preferred Stock and the Common Stock voting as

9

separate classes shall terminate at the next annual meeting of stockholders.

(3) As long as any shares of the Preferred stock remain outstanding, the Corporation shall not at any time without the consent of the Holders of at least a majority of the shares of the Preferred stock at the time outstanding, given in person or by proxy, either in writing or at a meeting called for that purpose, at which the holders of the Preferred Stock shall vote separately as a class (unless the consent of the holders of a greater number of such shares shall be required by statute):

(i) create, authorize or issue any additional class of stock ranking prior to or on a parity with the Preferred Stock or increase the authorized amount of the Preferred stock or any additional class of stock ranking prior to or on a parity with the Preferred stock or create or authorize any obligation or security convertible into shares of stock of any class ranking prior to or on a parity with either the Preferred Stock;

(ii) amend, alter or repeal any provisions of the Certificate of Incorporation or By-Laws of the Corporation provided, however, that the amendment of the Certificate of Incorporation of the Corporation to create, increase or decrease the authorized amount of any class of stock ranking junior to the Preferred Stock, or to increase or decrease the par value of any class of stock ranking junior to the Preferred Stock thereof and may be effected by the affirmative vote of the holders of a majority of the stock of the corporation which is entitled to vote; or

(iii) sell, lease or covey all or substantially all of the property or business of the Corporation or a wholly-owned subsidiary of the Corporation (except to the Corporation), or consolidate or merge the Corporation or any wholly-owned subsidiary of the Corporation with any other corporation (except a consolidation or merger of the Corporation with any wholly-

10

owned subsidiary), or voluntarily liquidate, dissolve or wind up the corporation.

Shares of stock in this corporation shall not be transferred or sold except pursuant to the provisions of Article Five hereof, and shall be subject to such restrictions as may be provided in the By-Laws of the corporation.

Subject to Section 3(i) and (ii), above, upon a resolution adopted by the holders of not less than three-fourths (3/4) of all of the shares of stock of the corporation issued and outstanding at the time of the adoption of such resolution, the corporation shall have the power to issue preferred stock, increase the number of authorized shares of common stock, or create a new class of common or preferred stock, as the case may be, with such preferences, voting powers, limitations, restrictions and qualifications as may be determined by such resolution.

### ARTICLE FIVE

Except as hereinafter set forth, each shareholder of common stock of the corporation shall be entitled to preemptive rights so that whenever additional shares of stock are offered for sale, shareholders of record of common stock on the date of the offer shall have the right to subscribe to the portion of the shares offered as the number of shares held by them bears to the total number of outstanding shares. This right shall terminate if not exercised within thirty (30) days of the offer. If the right is not exercised, the stock shall not be offered for sale to others at a lower price than that offered to the shareholders without the shareholders again being accorded preemptive rights to subscribe. No shareholder shall be entitled to preemptive rights on shares of common stock issued by the corporation to any employee's pension, profit-sharing, stock bonus or similar employee benefit plan approved by the holders of a majority of the outstanding shares of the common stock of the corporation, which plan meets the requirements for qualification under the Internal Revenue Code or any other law thereof or supplement thereto, or on any shares issued by the corporation pursuant to any stock option plan which provided for the issuance of shares to officers or employees of the corporation or any of its subsidiaries and which plan has been approved by the holders of a majority of the outstanding shares of common stock of the corporation.

11

## ARTICLE SIX

Subject to the provisions of Article Four D(3), each outstanding share of common stock of the corporation shall be entitled to one (1) vote for each matter submitted to a vote at any meeting of shareholders of the corporation. In the event of the election of directors, each outstanding share of common stock, unless designated as a non-voting class or fraction of voting shares, of the corporation shall be entitled to one (1) vote per share. The voting for directors shall not be cumulative.

## ARTICLE SEVEN

(a) The officers of the corporation shall be a president, a vice-president or vice-presidents, a secretary or secretaries and a treasurer. The corporation may have such additional officers as may be determined in accordance with the By-Laws from time to time. The officers shall have the powers, perform the duties and be appointed as may be determined in accordance with the By-Laws. Any person may hold two or more offices of said corporation, if so provided by the By-Laws.

(b) The Board of Directors shall consist of such number of persons, not less than three (3) nor more than seven (7), provided, however that the number of directors may be increased to any number not exceeding eleven (11) by the formal assent of the stockholders of the corporation at a regular or special meeting of stockholders representing or holding a majority of the stock, as provided in Section 2105(6) of Title 18 of the Guam Code Annotated and as shall be determined in accordance with the By-Laws from time to time. The officers of the corporation, need not be stockholders of the corporation, but the directors must be. The directors (and alternate directors or substitute directors, if any) shall be elected or appointed in the manner provided by the By-Laws.

The persons who are the first directors of the corporation and their addresses are as follows:

| DIRECTORS | ADDRESS |
|---|---|
| KURT S. MOYLAN<br>President | 171 Golindrina Street<br>Barrigada Heights, Guam |
| JUDITH A. MOYLAN<br>Treasurer | 171 Golindrina Street<br>Barrigada Heights, Guam |

12

| KALEO S. MOYLAN | 247 Summer Palace |
| Secretary/VP | Harmon Loop, Guam |
| | |
| MIKI R. MOYLAN | 187 Asucena Street |
| | Barrigada Heights, Guam |
| | |
| TROY K. MOYLAN | 171 Golindrina Street |
| | Barrigada Heights, Guam |
| | |
| RICARDO P. LEGASPI | 148 Belmont Street |
| | Jonestown, Guam |

(c)   All the powers and authority of the corporation shall be vested in and may be exercised by the Board of Directors, except as otherwise provided by law, these Articles of Incorporation, or the By-Laws of the corporation; and, in furtherance and not in limitation of said general powers, the Board of Directors shall have power to:  acquire and dispose of property; appoint in writing a general manager and such other managers, officers or agents of the corporation as in its judgment this business may require, and to confer upon and to delegate to them by power of attorney or otherwise, such power and authority as it shall determine; fix the salaries or compensation of any or all of its officers, agents and employees, and in its discretion, require security of any of them for the faithful performance of any of their duties, declare dividends in accordance with law when it shall deem it expedient; make rules and regulations not inconsistent with law or these Articles of Incorporation or the By-Laws for the transaction of business; instruct the officers or agents of the corporation  with respect to, and to authorize the voting of, stock of other corporations owned or held by this corporation; incur  such  indebtedness  as  may  be  deemed  necessary,  which indebtedness may exceed the amount of the corporation's capital stock; create such committees (including, but not limited to, an executive committee or committees) and to designate and to confer upon such committees such powers and authority as may by resolution be set forth for the purpose of carrying on or exercising any of the powers of the corporation; create and set aside reserve refunds for any purpose, and to invest any funds of the corporation in such securities or other property as to it may seem proper; remove or suspend any officer; and, generally to do any and every lawful act necessary or proper to carry out and into effect the powers, purposes and objects of this corporation.

(d)   Except   as   otherwise   provided   herein,   the corporation  shall  not  without  the  affirmative  vote  at  a shareholders meeting called for the purpose of authorizing such

13

action, or the written consent with or without a meeting of the holders of at least a majority of the then issued and outstanding shares of common stock:

        (1)    Amend, alter or repeal any of the provisions of these Articles of Incorporation.

        (2)    Sell or otherwise dispose of substantially all of the corporation's assets.

        (3)    Merge or consolidate with or into any other corporation.

        (4)    Dissolve or liquidate the corporation.

### ARTICLE EIGHT

The corporation shall have succession by its corporate name for the term of fifty (50) years, and as thereafter extended in the manner provided by law, and shall have all the powers herein enumerated or implied herefrom and the powers now provided (or which may be hereafter provided) by law for incorporated companies.

### ARTICLE NINE

Service of legal process may be made upon the corporation in the manner provided by law.

### ARTICLE TEN

No stockholder shall be liable for the debts of the corporation beyond the amount which may be due or unpaid upon any share or shares of stock of said corporation subscribed by him.

### ARTICLE ELEVEN

The names and residences of the incorporators who are the persons subscribing to the capital stock of this corporation, the amount of stock subscribed, and the amount subscribed by each, and the sum paid by each on his subscription, are as follows:

| NAME | AMOUNT SUBSCRIBED | AMOUNT PAID |
|------|-------------------|-------------|
| MOYLANS INSURANCE UNDERWRITERS, INC. | 100 Shares | $ 1,000.00 |

14

| | | | |
|---|---|---|---|
| KURT S. MOYLAN<br>Barrigada Heights, Guam | 1 Share | $ | 10.00 |
| JUDITH A. MOYLAN<br>Barrigada Heights, Guam | 1 Share | $ | 10.00 |
| KALEO S. MOYLAN<br>Harmon Loop, Guam | 1 Share | $ | 10.00 |
| MIKI R. MOYLAN<br>Barrigada Heights, Guam | 1 Share | $ | 10.00 |
| TROY K. MOYLAN<br>Barrigada Heights, Guam | 1 Share | $ | 10.00 |
| RICARDO P. LEGASPI<br>Jonestown, Guam | 1 Share | $ | 10.00 |

for a total of ONE HUNDRED SIX (106) shares subscribed and ONE THOUSAND SIXTY DOLLARS ($1,060.00) paid in.

IN WITNESS WHEREOF, The directors hereinbefore named have hereunto set their hands this _/2_ day of December, 1997.

_____
KURT S. MOYLAN

_____
JUDITH A. MOYLAN

_____
KALEO S. MOYLAN

_____
MIKI R. MOYLAN

_____
TROY K. MOYLAN

_____
RICARDO P. LEGASPI

15

GUAM                         )

                                ) ss:

CITY OF AGANA          )

On this *12th* day of *December*, 19*97*, before me, a Notary Public in and for Guam, personally appeared **KURT S. MOYLAN**, known to me to be there person whose name is subscribed to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

) S E A L (

---

> **CECILIA A. ANAS**
> Notary Public
> In and for the Territory of Guam, U.S.A.
> My Commission Expires: May. 06, 1998
> 101 Agana Shopping Center Agana, Guam 96910

GUAM                         )

                                ) ss:

CITY OF AGANA          )

On this *12th* day of *December*, 19*97*, before me, a Notary Public in and for Guam, personally appeared **JUDITH A. MOYLAN**, known to me to be the person whose name is subscribed to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

) S E A L (

---

> **CECILIA A. ANAS**
> Notary Public
> In and for the Territory of Guam, U.S.A.
> My Commission Expires: May. 06, 1998
> 101 Agana Shopping Center Agana, Guam 96910

16

GUAM                     )
                         ) ss:
CITY OF AGANA     )

On this 12th day of _December_, 19 97, before me,
a Notary Public in and for Guam, personally appeared **KALEO S.
MOYLAN,** known to me to be the person whose name is subscribed
to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to
me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal the day and year first above written.

) S E A L (

 

> **CECILIA A. ANAS**
> Notary Public
> In and for the Territory of Guam, U.S.A.
> My Commission Expires: May. 06, 1998
> 101 Agana Shopping Center Agana, Guam 96910

GUAM                     )
                         ) ss:
CITY OF AGANA     )

On this 12th day of _December_, 19 97, before me,
a Notary Public in and for Guam, personally appeared **MIKI R.
MOYLAN,** known to me to be the person whose name is subscribed
to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to
me that she executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal the day and year first above written.

) S E A L (

 

> **CECILIA A. ANAS**
> Notary Public
> In and for the Territory of Guam, U.S.A.
> My Commission Expires: May. 06, 1998
> 101 Agana Shopping Center Agana, Guam 96910

17

GUAM                          )
                              ) ss:
CITY OF AGANA                 )

      On this _12th_ day of _December_, 19_97_, before me, a Notary Public in and for Guam, personally appeared **TROY K. MOYLAN**, known to me to be the person whose name is subscribed to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to me that he executed the same.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

) S E A L (

CECILIA A. ANAS
Notary Public
In and for the Territory of Guam, U.S.A.
My Commission Expires: May. 06, 1998
101 Agana Shopping Center Agana, Guam 96910

GUAM                          )
                              ) ss:
CITY OF AGANA                 )

      On this _12th_ day of _December_, 19_97_, before me, a Notary Public in and for Guam, personally appeared **RICARDO P. LEGASPI**, known to me to be the person whose name is subscribed to the foregoing **ARTICLES OF INCORPORATION** and acknowledged to me that he executed the same.

      IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

) S E A L (

CECILIA A. ANAS
Notary Public
In and for the Territory of Guam, U.S.A.
My Commission Expires: May. 06, 1998
101 Agana Shopping Center Agana, Guam 96910

C0978118.MTC

18

RECEIVED

FEB 1 1 1998

DEPT. OF REV. & TAX
GOV'T OF GUAM
BLB 03

AMENDMENT TO ARTICLES OF INCORPORATION

OF

NETCOR INC. HOLDING COMPANY


BE IT KNOWN that pursuant to the unanimous affirmative vote of holders of one hundred six (106) shares present in person or by proxy at a duly called special meeting of the shareholders the following amendment to Article IV of the Articles of Incorporation filed on December 15, 1997, at the Government of Guam Department of Revenue and Taxation -- Business License Division:

The authorized capital stock of the corporation shall be FIVE MILLION DOLLARS ($5,000,000.00) divided into THREE HUNDRED THOUSAND (300,000) shares of common stock with the par value of TEN DOLLARS ($10.00) per share, all with equal voting rights, powers and privileges; and TWENTY THOUSAND (20,000) shares of preferred stock with a par value of ONE HUNDRED DOLLARS ($100.00) per share.

The Board of Directors is authorized to determine the consideration and the terms and conditions on which unissued capital stock may be issued, and what portion, if any, shall be paid-in surplus, subject to the laws of Guam.

A statement of the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, in aspect of the Preferred Stock of the Corporation is as follows:


A.    Dividends:

(1)    The holders of the Preferred Stock shall be entitled to receive, as and when declared by the Board of Directors out of funds of the Corporation legally available therefor, cash dividends at the rate of Six Dollars ($6.00) per share per annum, cumulative from the date of issuance thereof (computed on the basis of a 360-day year, 30-day month), payable quarterly on the last day of March, June, September and December in each year, to stockholders of record on such date, not exceeding 60 days preceding such dividend dates, as shall be fixed for the purpose by the Board of Directors in

advance of payment of each particular dividend.

(2) So long as any shares of Preferred Stock
are outstanding, no dividend shall be declared or
paid or other distribution made on the Common stock
nor shall the Corporation purchase or otherwise
acquire, or permit an subsidiary of the Corporation
to purchase or otherwise acquire, any shares of
Common stock until all past quarterly dividend
periods shall have been paid in full or declared in
full and sums set apart for the payment thereof and
there shall exist no default in the payment of any
amount payable with respect to the redemption of any
shares of Preferred Stock.

(3) The holders of the Preferred Stock shall
not be entitled to receive any dividends thereon
other than cash dividends at the rate herein above
provided. Arrears of dividends shall not bear
interest.

(4) Subject to the foregoing provisions, the
holders of the Common Stock shall be entitled to
receive, as and when declared by the Board of
Directors out of the remaining funds of the
Corporation legally available therefor, such
dividends (payable in cash, stock or otherwise) as
the Board of Directors may from time to time
determine, payable to stockholders of record on such
dates, not exceeding 60 days preceding the dividend
payment dates, as shall be fixed for the purpose by
the Board of Directors in advance of payment of each
particular dividend.

B.   **Liquidation:**

(1) In the event of any liquidation,
dissolution or winding up of the Corporation,
whether voluntary or involuntary, then out of the
assets of the corporation before any distribution or
payment to the holders of the Common stock, the
holders of the Preferred Stock shall be entitled to
be paid the sum of One Hundred Dollars ($100) per
share, together with full cumulative dividends
accrued and unpaid to and including the date of such
liquidation, dissolution or winding up, whether or
not such dividends have been earned or declared; and
the holders of the Preferred Stock shall be entitled
to no other or further distribution.

2

(2) After payment in full to the holders of the Preferred Stock of the sums which such holders are entitled to receive in such case, the remaining assets of the corporation shall be distributed among and paid to the holders of the Common stock ratably in proportion to the number of shares of Common stock held by them respectively.

(3) If the assets of the corporation available for distribution to its stockholders shall be insufficient to permit payment in full to the holders of the Preferred Stock of the sums which such holders are entitled to receive in such case, then all of the assets available for distribution to the stockholders shall be distributed among and paid to the holders of the Preferred Stock ratably in proportion to the number of shares of Preferred Stock held by them respectively.

(4) The consolidation or merger of the corporation with any other corporation or corporations shall not be deemed a liquidation, dissolution or winding up of the Corporation within the meaning of this paragraph, provided that such consolidation or merger (except in the case of a consolidation or merger with one or more wholly-owned subsidiaries of the Corporation) shall have been consented to by the holders of a majority of the shares of the Preferred Stock at the time outstanding in the manner provided in paragraph D(3), infra.

C. **Redemption:**

(1) The Preferred Stock shall be redeemed by the Corporation pursuant to the following schedule:

(i) 5,000 shares on or before July 1, 2000;

(ii) 10,000 shares on or before July 1, 2001;

(iii) 5,000 shares on or before July 1, 2002;

and is subject to redemption in whole but not in part at the option of the Board of Directors. The price is One Hundred Dollars ($100) per share, together in every case with full cumulative

3

dividends accrued and unpaid to and including the date fixed for such redemption, whether or not such dividends have been earned or declared.

(2)    The aggregate of the amounts payable upon the redemption of a share of any class of stock is hereinafter referred to as the "redemption price".

(3)    Notice of the intention of the Corporation to redeem shares of any class of stock which is subject to redemption of the date and place for redemption shall be mailed at least 30 and not more than 60 days prior to the date to be redeemed at his last known address as shown by the records of the Corporation, but no failure to mail such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption except as to the holder to whom the Corporation failed to mail such notice or whose notice was defective. Any notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the holder receives such notice.

(4)    On and after the date of redemption designated in such notice, each holder of shares called for redemption, upon surrender to the Corporation at the place designated in such notice of the certificate or certificates for such shares, properly endorsed in blank for transfer in blank and bearing any necessary transfer tax stamps thereto affixed and canceled, shall thereupon be entitled to receive payment of the redemption price in cash. In case less than all shares represented by such surrendered certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(5)    If such notice of redemption shall have been duly given, and if on or before the redemption date funds necessary for the redemption of the shares to be redeemed shall have been set aside so as to be and continue to be available therefor, then notwithstanding that any certificate representing any shares so called for redemption shall not have been surrendered, the dividends thereon shall cease to accrue from and after the date of redemption and all rights with respect to the shares so called for redemption shall forthwith after such redemption

4

date cease, except only the right of the holder to receive the redemption price without interest. Any moneys so set aside by the Corporation and unclaimed by the end of three years from the date fixed for such redemption shall revert to the general funds of the Corporation.

(6)   All shares of the Preferred Stock redeemed or otherwise acquired by the Corporation shall be canceled and retired and shall not be reissued.

## D.   Voting Rights:

(1)   Each holder of shares of the Common Stock shall be entitled to one vote for each share standing in the name of such holder on the books of the Corporation,

(2)   At any time when the Corporation shall default in the payment of dividends on the Preferred Stock for two consecutive quarterly dividend periods; or when the Corporation shall default in the payment of any amount payable or when the Corporation shall default in the payment of any amount payable with respect to the redemption of any shares of Preferred Stock; or when the Corporation shall default in the payment of principal or interest on any obligation for borrowed money, or in the performance of any of the terms or any instrument evidencing or relating to such obligation, and such default shall continue for more than the period of grace, if any, specified therein; or if the corporation shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due or shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition of bankruptcy filed against the Corporation in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Corporation or of all or any substantial part of the properties of the corporation, or the Corporation or its directors or

5

majority stockholders shall take any action looking
to the dissolution or liquidation of the
corporation; or if within 60 days after the
commencement of an action against the corporation
seeking any reorganization, arrangement,
composition, readjustment, liquidation, dissolution
or similar relief under any present or future
statute, law or regulation, such action shall not
have been dismissed or all orders or proceedings
thereunder affecting the operations or the business
of the Corporation stayed, or if the stay of any
such order or proceeding shall thereafter be set
aside, or if within 60 days after the appointment
without the consent or acquiescence of the
Corporation of any trustee, receiver or liquidator
of the Corporation or of all or any substantial part
of the properties or if a Final Judgment shall be
rendered against the Corporation and if, within 60
days after entry thereof, such judgment shall not
have been discharged or execution thereof stayed
pending appeal; or if, within 60 days after the
expiration of any such stay, such judgment shall not
have been discharged; then and in every such event
(hereinafter referred to as an "Event of Default")
the holders of the Preferred Stock voting separately
as a class shall be entitled to elect the smallest
number of directors of the Corporation which will be
at least a majority of the Board of directors, and
the holders of the Common Stock voting separately as
a class shall be entitled to elect the remaining
directors of the Corporation. However, if and when
all Events of Default which may have occurred shall
thereafter be cured, the holders of the Preferred
Stock shall then be divested of such voting power,
and the Common Stock shall be entitled to elect all
directors of the corporation voting together as one
class, but always subject to the same provisions for
the vesting of such voting power in the Preferred
Stock in the case of any future Event of Default. A
special meeting of the Stockholders, at which the
holders of the Preferred Stock shall vote as a class
and the holders of the common Stock shall vote as a
class, shall be held within 10 days after the
accrual of any such voting power, and upon notice
similar to that provided in the By-Laws of the
Corporation for stockholders meetings, upon call by
the holders of not less than 10% of the number of
shares of the Preferred stock at the time
outstanding or at the request in writing of the

6

holders of not less than 5% of the number of shares
of the Preferred Stock at the time outstanding,
addressed to the Secretary of the Corporation at the
principal business office of the corporation, in
which case such Secretary shall call such meeting to
be held.   The holders of the Preferred Stock and the
Common Stock, respectively, shall be entitled to
exercise such separate class voting power at a
special meeting of stockholders called as aforesaid
and at the next and succeeding annual meetings until
termination of such separate class voting power.
Whenever the right of the holders of the Preferred
Stock and Common Stock to elect directors by voting
as separate classes has arisen, the terms of office
of all persons who then may be directors of the
corporation shall terminate upon the election of
their successors at a meeting of the stockholders as
above provided.    Upon termination of such voting
power at any time by reason of the curing of all
Events of Default, the terms of office of all
persons who may have been elected directors of the
Corporation by vote of the holders of the Preferred
Stock and the Common Stock voting as separate
classes shall terminate at the next annual meeting
of stockholders.

(3)   As long as any shares of the Preferred
stock remain outstanding, the Corporation shall not
at any time without the consent of the Holders of at
least a majority of the shares of the Preferred
stock at the time outstanding, given in person or by
proxy, either in writing or at a meeting called for
that purpose, at which the holders of the Preferred
Stock shall vote separately as a class (unless the
consent of the holders of a greater number of such
shares shall be required by statute):

(i)   create, authorize or issue any additional
class of stock ranking prior to or  on a
parity with the Preferred Stock or
increase the authorized amount of the
Preferred stock or any additional class of
stock ranking prior to or on a parity with
the Preferred stock or create or authorize
any obligation or security convertible
into shares of stock of any class ranking
prior to or on a parity with either the
Preferred Stock;

7

(ii) amend, alter or repeal any provisions of the Certificate of Incorporation or By-Laws of the Corporation provided, however, that the amendment of the Certificate of Incorporation of the Corporation to create, increase or decrease the authorized amount of any class of stock ranking junior to the Preferred Stock, or to increase or decrease the par value of any class of stock ranking junior to the Preferred Stock thereof and may be effected by the affirmative vote of the holders of a majority of the stock of the corporation which is entitled to vote; or

(iii)   sell, lease or covey all or substantially all of the property or business of the Corporation or a wholly-owned subsidiary of the Corporation (except to the Corporation), or consolidate or merge the Corporation or any wholly-owned subsidiary of the Corporation with any other corporation (except a consolidation or merger of the Corporation with any wholly-owned subsidiary), or voluntarily liquidate, dissolve or wind up the corporation.

Shares of stock in this corporation shall not be transferred or sold except pursuant to the provisions of Article Five hereof, and shall be subject to such restrictions as may be provided in the By-Laws of the corporation.

Subject to Section 3(i) and (ii), above, upon a resolution adopted by the holders of not less than three-fourths (3/4) of all of the shares of stock of the corporation issued and outstanding at the time of the adoption of such resolution, the corporation shall have the power to issue preferred stock, increase the number of authorized shares of common stock, or create a new class of common or preferred stock, as the case may be, with such preferences, voting powers, limitations, restrictions and qualifications as may be determined by such resolution.

8

Certified as a correct and actual statement of the resolution adopted at the special meeting of the shareholders.

Dated this _2nd_ day of January, 1998.


_____
KURT S. MOYLAN
President


_____
KALEO S. MOYLAN
Secretary


CO98813.MTC

# AMENDMENT TO ARTICLES OF INCORPORATION

## OF

## NETCOR INC. HOLDING COMPANY

RECEIVED
JUL 1 2 1998
DEPT. OF REV. & TAX
GOV'T OF GUAM
BLDG 3

BE IT KNOWN that pursuant to the unanimous affirmative vote of holders of one hundred six (106) shares present in person or by proxy at a duly called special meeting of the shareholders the following amendment to Article IV of the Articles of Incorporation filed on December 15, 1997, at the Government of Guam Department of Revenue and Taxation -- Business License Division:

The authorized capital stock of the corporation shall be FIFTEEN MILLION DOLLARS ($15,000,000.00) divided into ONE MILLION FIFTY THOUSAND (1,050,000) shares of common stock with the par value of TEN DOLLARS ($10.00) per share, all with equal voting rights, powers and privileges; and FORTY FIVE THOUSAND (45,000) shares of Preferred Stock with a par value of ONE HUNDRED DOLLARS ($100.00) per share. The initial series of Preferred Stock shall be designated "Class A Preferred Stock", and the number of shares constituting the initial offering of Class A Preferred Stock shall be TWENTY THOUSAND (20,000) shares.

The Board of Directors is authorized to determine the consideration and the terms and conditions on which unissued capital stock may be issued, and what portion, if any, shall be paid-in surplus, subject to the laws of Guam.

A statement of the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, in respect of the Class A Preferred Stock of the Corporation is as follows:

## A. **Dividends:**

(1) The holders of the Class A Preferred Stock shall be entitled to receive, as and when declared by the Board of Directors out of funds of the Corporation legally available therefor, cash dividends at the rate of Six Dollars ($6.00) per share per annum, cumulative from the date of issuance thereof (computed on the basis of a 360-day year, 30-day month), payable quarterly on the last

day of March, June, September and December in each year, to stockholders of record on such date, not exceeding 60 days preceding such dividend dates, as shall be fixed for the purpose by the Board of Directors in advance of payment of each particular dividend.

(2) So long as any shares of Class A Preferred Stock are outstanding, no dividend shall be declared or paid or other distribution made on the Common stock nor shall the Corporation purchase or otherwise acquire, or permit an subsidiary of the Corporation to purchase or otherwise acquire, any shares of Common stock until all past quarterly dividend periods shall have been paid in full or declared in full and sums set apart for the payment thereof and there shall exist no default in the payment of any amount payable with respect to the redemption of any shares of Class A Preferred Stock.

(3) The holders of the Class A Preferred Stock shall not be entitled to receive any dividends thereon other than cash dividends at the rate herein above provided. Arrears of dividends shall not bear interest.

(4) Subject to the foregoing provisions, the holders of the Common Stock shall be entitled to receive, as and when declared by the Board of Directors out of the remaining funds of the Corporation legally available therefor, such dividends (payable in cash, stock or otherwise) as the Board of Directors may from time to time determine, payable to stockholders of record on such dates, not exceeding 60 days preceding the dividend payment dates, as shall be fixed for the purpose by the Board of Directors in advance of payment of each particular dividend.

B. **Liquidation:**

(1) In the event of any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, then out of the assets of the corporation before any distribution or payment to the holders of the Common stock, the holders of the Class A Preferred Stock shall be entitled to be paid the sum of One Hundred Dollars ($100) per share, together with full cumulative

2

dividends accrued and unpaid to and including the date of such liquidation, dissolution or winding up, whether or not such dividends have been earned or declared; and the holders of the Class A Preferred Stock shall be entitled to no other or further distribution.

(2) After payment in full to the holders of the Class A Preferred Stock of the sums which such holders are entitled to receive in such case, the remaining assets of the corporation shall be distributed among and paid to the holders of the Common stock ratably in proportion to the number of shares of Common stock held by them respectively.

(3) If the assets of the corporation available for distribution to its stockholders shall be insufficient to permit payment in full to the holders of the Class A Preferred Stock of the sums which such holders are entitled to receive in such case, then all of the assets available for distribution to the stockholders shall be distributed among and paid to the holders of the Class A Preferred Stock ratably in proportion to the number of shares of Class A Preferred Stock held by them respectively.

(4) The consolidation or merger of the corporation with any other corporation or corporations shall not be deemed a liquidation, dissolution or winding up of the Corporation within the meaning of this paragraph, provided that such consolidation or merger (except in the case of a consolidation or merger with one or more wholly-owned subsidiaries of the Corporation) shall have been consented to by the holders of a majority of the shares of the Class A Preferred Stock at the time outstanding in the manner provided in paragraph D(3), infra.

C.   <u>Redemption:</u>

(1) The Class A Preferred Stock shall be redeemed by the Corporation pursuant to the following schedule:

(i)        5,000 shares on or before July 1, 2000;

3

(ii)     10,000 shares on or before July
         1, 2001;

(iii)    5,000 shares on or before July
         1, 2002;

and is subject to redemption in whole but not in part at the option of the Board of Directors. The price is One Hundred Dollars ($100) per share, together in every case with full cumulative dividends accrued and unpaid to and including the date fixed for such redemption, whether or not such dividends have been earned or declared.

(2) The aggregate of the amounts payable upon the redemption of a share of any class of stock is hereinafter referred to as the "redemption price".

(3) Notice of the intention of the Corporation to redeem shares of any class of stock which is subject to redemption of the date and place for redemption shall be mailed at least 30 and not more than 60 days prior to the date to be redeemed at his last known address as shown by the records of the Corporation, but no failure to mail such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption except as to the holder to whom the Corporation failed to mail such notice or whose notice was defective. Any notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the holder receives such notice.

(4) On and after the date of redemption designated in such notice, each holder of shares called for redemption, upon surrender to the Corporation at the place designated in such notice of the certificate or certificates for such shares, properly endorsed in blank for transfer in blank and bearing any necessary transfer tax stamps thereto affixed and canceled, shall thereupon be entitled to receive payment of the redemption price in cash. In case less than all shares represented by such surrendered certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

4

(5) If such notice of redemption shall have been duly given, and if on or before the redemption date funds necessary for the redemption of the shares to be redeemed shall have been set aside so as to be and continue to be available therefor, then notwithstanding that any certificate representing any shares so called for redemption shall not have been surrendered, the dividends thereon shall cease to accrue from and after the date of redemption and all rights with respect to the shares so called for redemption shall forthwith after such redemption date cease, except only the right of the holder to receive the redemption price without interest. Any moneys so set aside by the Corporation and unclaimed by the end of three years from the date fixed for such redemption shall revert to the general funds of the Corporation.

(6) All shares of the Class A Preferred Stock redeemed or otherwise acquired by the Corporation shall be canceled and retired and shall not be reissued.

D. **Voting Rights**:

(1) Each holder of shares of the Common Stock shall be entitled to one vote for each share standing in the name of such holder on the books of the Corporation,

(2) At any time when the Corporation shall default in the payment of dividends on the Class A Preferred Stock for two consecutive quarterly dividend periods; or when the Corporation shall default in the payment of any amount payable or when the Corporation shall default in the payment of any amount payable with respect to the redemption of any shares of Class A Preferred Stock; or when the Corporation shall default in the payment of principal or interest on any obligation for borrowed money, or in the performance of any of the terms or any instrument evidencing or relating to such obligation, and such default shall continue for more than the period of grace, if any, specified therein; or if the corporation shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due or shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or insolvent, or

5

shall file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition of bankruptcy filed against the Corporation in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the Corporation or of all or any substantial part of the properties of the corporation, or the Corporation or its directors or majority stockholders shall take any action looking to the dissolution or liquidation of the corporation; or if within 60 days after the commencement of an action against the corporation seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such action shall not have been dismissed or all orders or proceedings thereunder affecting the operations or the business of the Corporation stayed, or if the stay of any such order or proceeding shall thereafter be set aside, or if within 60 days after the appointment without the consent or acquiescence of the Corporation of any trustee, receiver or liquidator of the Corporation or of all or any substantial part of the properties or if a Final Judgment shall be rendered against the Corporation and if, within 60 days after entry thereof, such judgment shall not have been discharged or execution thereof stayed pending appeal; or if, within 60 days after the expiration of any such stay, such judgment shall not have been discharged; then and in every such event (hereinafter referred to as an "Event of Default") the holders of the Class A Preferred Stock voting separately as a class shall be entitled to elect the smallest number of directors of the Corporation which will be at least a majority of the Board of directors, and the holders of the Common Stock voting separately as a class shall be entitled to elect the remaining directors of the Corporation. However, if and when all Events of Default which may have occurred shall thereafter be cured, the holders of the Class A Preferred Stock shall then be divested of such voting power, and the Common Stock shall be entitled to elect all directors of the corporation voting together as one class, but always

6

subject to the same provisions for the vesting of such voting power in the Class A Preferred Stock in the case of any future Event of Default. A special meeting of the Stockholders, at which the holders of the Class A Preferred Stock shall vote as a class and the holders of the common Stock shall vote as a class, shall be held within 10 days after the accrual of any such voting power, and upon notice similar to that provided in the By-Laws of the Corporation for stockholders meetings, upon call by the holders of not less than 10% of the number of shares of the Class A Preferred Stock at the time outstanding or at the request in writing of the holders of not less than 5% of the number of shares of the Class A Preferred Stock at the time outstanding, addressed to the Secretary of the Corporation at the principal business office of the corporation, in which case such Secretary shall call such meeting to be held. The holders of the Class A Preferred Stock and the Common Stock, respectively, shall be entitled to exercise such separate class voting power at a special meeting of stockholders called as aforesaid and at the next and succeeding annual meetings until termination of such separate class voting power. Whenever the right of the holders of the Class A Preferred Stock and Common Stock to elect directors by voting as separate classes has arisen, the terms of office of all persons who then may be directors of the corporation shall terminate upon the election of their successors at a meeting of the stockholders as above provided. Upon termination of such voting power at any time by reason of the curing of all Events of Default, the terms of office of all persons who may have been elected directors of the Corporation by vote of the holders of the Class A Preferred Stock and the Common Stock voting as separate classes shall terminate at the next annual meeting of stockholders.

(3) As long as any shares of the Class A Preferred Stock remain outstanding, the Corporation shall not at any time without the consent of the Holders of at least a majority of the shares of the Class A Preferred Stock at the time outstanding, given in person or by proxy, either in writing or at a meeting called for that purpose, at which the holders of the Class A Preferred Stock shall vote separately as a class (unless the consent of the

7

holders of a greater number of such shares shall be required by statute):

(i) create, authorize or issue any additional class of stock ranking prior to or on a parity with the Class A Preferred Stock or increase the authorized amount of the Class A Preferred Stock or any additional class of stock ranking prior to or on a parity with the Class A Preferred Stock or create or authorize any obligation or security convertible into shares of stock of any class ranking prior to or on a parity with either the Class A Preferred Stock;

(ii) amend, alter or repeal any provisions of the Certificate of Incorporation or By-Laws of the Corporation provided, however, that the amendment of the Certificate of Incorporation of the Corporation to create, increase or decrease the authorized amount of any class of stock ranking junior to the Class A Preferred Stock, or to increase or decrease the par value of any class of stock ranking junior to the Class A Preferred Stock thereof and may be effected by the affirmative vote of the holders of a majority of the stock of the corporation which is entitled to vote; or

(iii) sell, lease or covey all or substantially all of the property or business of the Corporation or a wholly-owned subsidiary of the Corporation (except to the Corporation), or consolidate or merge the Corporation or any wholly-owned subsidiary of the Corporation with any other corporation (except a consolidation or merger of the Corporation with any wholly-owned subsidiary), or voluntarily liquidate, dissolve or wind up the corporation.

8

Shares of stock in this corporation shall not be transferred or sold except pursuant to the provisions of Article Five hereof, and shall be subject to such restrictions as may be provided in the By-Laws of the corporation.

Subject to Section 3(i) and (ii), above, upon a resolution adopted by the holders of not less than three-fourths (3/4) of all of the shares of stock of the corporation issued and outstanding at the time of the adoption of such resolution, the corporation shall have the power to issue additional shares Class A Preferred Stock, increase the number of authorized shares of common stock, or create a new class of common or Preferred Stock, as the case may be, with such preferences, voting powers, limitations, restrictions and qualifications as may be determined by such resolution.

Certified as a correct and actual statement of the resolution adopted at the special meeting of the shareholders.

Dated this __15__ day of July, 1998.


_____
KURT S. MOYLAN
President

_____
KALEO S. MOYLAN
Secretary

C098830.MTC

9

## AMENDMENT NO. 3 TO
## ARTICLES OF INCORPORATION
### OF
## NETCOR INC. HOLDING COMPANY

BE IT KNOWN that pursuant to the unanimous affirmative vote of holders of one hundred six (106) shares present in person or by proxy at a duly called special meeting of the shareholders, to Article IV of the Articles of Incorporation filed on December 15, 1997, at the Government of Guam Department of Revenue and Taxation Business License Division is hereby restated to read as follows:

The authorized capital stock of the corporation shall be FIFTEEN MILLION DOLLARS ($15,000,000.00) divided into ONE MILLION FIFTY THOUSAND (1,050,000) shares of Common Stock with the par value of TEN DOLLARS ($10.00) per Share, all with equal voting rights, powers and privileges; ("Common Stock"); and FORTY FIVE THOUSAND (45,000) shares of Preferred Stock with a par value of ONE HUNDRED DOLLARS ($100.00) per share. The initial series of Preferred Stock shall be designated "Class A Preferred Stock", and the number of shares constituting the Class A Preferred Stock shall be TWENTY FIVE THOUSAND (25,000) shares.

The Board of Directors is authorized to determine the consideration and the terms and conditions on which unissued capital stock may be issued, and what portion, if any, shall be paid-in surplus, subject to the laws of Guam.

A statement of the powers, preferences and rights, and the qualifications, limitations or restrictions thereof, in respect of the Class A Preferred Stock of the corporation is as follows:

### A.    Dividends:

(1)    The holders of the Class A Preferred Stock shall be entitled to receive, as and when declared by the Board of Directors out of funds of the corporation legally available therefor, cash (or cash equivalent) dividends at the rate of Six Dollars ($6.00) per share per annum, cumulative from the date of issuance thereof (computed on the basis of a 360-day year, 30-day month), payable quarterly on the last day of March, June, September and December in each year, to Stockholders of record on such class, not exceeding 60 days preceding such dividend dates, as shall be fixed for the

purpose by the Board of Directors in advance of payment of each particular dividend.

(2)    So long as any shares of Class A Preferred Stock are outstanding: (a) no dividend of any sort shall be declared or paid or other distribution made on the Common Stock and (b) the corporation shall not purchase or otherwise acquire, or permit any subsidiary of the corporation to purchase or otherwise acquire, any shares of Common Stock of the corporation.

(3)    The holders of Class A Preferred Stock shall not be entitled to receive any dividends thereon other than cash dividends at the rate herein above provided, except that for the first eight quarterly payment dates following the issuance of the Class A Preferred Stock, dividends to the holders of the Class A Preferred Stock may at the option of the corporation be paid in additional shares of Class A Preferred Stock upon which dividends will also be payable. For the purpose of paying said dividends in such stock the value of the Class A Preferred Stock and the number of shares issued shall be its $100.00 par value rounded up to the nearest $100.00. Arrears of dividends shall not bear interest.

(4)    Subject to the foregoing provisions, the holders of the Common Stock shall be entitled to receive, as and when declared by the Board of Directors out of the remaining funds of the corporation legally available therefor, such dividends (payable in cash, stock or otherwise) as the Board of Directors may from time to time determine, payable to stockholders of record on such dates, not exceeding 60 days preceding the dividend payment dates, as shall be fixed for the purpose by the Board of Directors in advance of payment of each particular dividend.

## B.    Liquidation:

(1)    In the event of any liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary, then out of the assets of the corporation before any distribution or payment to the holders of the Common Stock, the holders of the Class A Preferred Stock shall be entitled to be paid the sum of One Hundred Dollars ($100) per share, together with full cumulative dividends accrued and unpaid to and including the date of such liquidation, dissolution or winding up, whether or not such dividends have been earned or declared; and the holders of the Class A Preferred Stock shall be entitled to no other or further distribution.

2

(2)     After payment in full to the holders of the Class A Preferred Stock of the sums which such holders are entitled to receive in such case, the remaining assets of the corporation shall be distributed among and paid to the holders of the Common Stock ratably in proportion to the number of shares of Common Stock held by them respectively.

(3)     If the assets of the corporation available for distribution to its stockholders shall be insufficient to permit payment in full to the holders of the Class A Preferred Stock of the sums which such holders are entitled to receive in such case, then all of the assets available for distribution to the stockholders shall be distributed among and paid to the holders of the Class A Preferred Stock ratably in proportion to the number of shares of Class A Preferred Stock held by them respectively.

(4)     The consolidation or merger of the corporation with any other corporation or corporations shall not be deemed a liquidation, dissolution or winding up of the corporation within the meaning of this paragraph unless not consented to by the holders of a majority of the shares of the Class A Preferred Stock at the time outstanding in the manner provided in paragraph D(3), infra.

## C.     Redemption:

(1)     The Class A Preferred Stock shall be redeemed by the corporation pursuant to the following schedule:

(i)     5,000 shares on or before September 30, 2001;

(ii)     10,000 shares on or before September 30, 2002;

(iii)     the balance of any shares outstanding on or before September 30, 2003;

and is subject to redemption in whole but not in part at the option of the corporation. The redemption price is One Hundred Dollars ($100) per share, together in every case with full cumulative dividends accrued and unpaid to and including the date fixed for such redemption, whether or not such dividends have been earned or declared.

3

(2)     The aggregate of the amounts payable upon the redemption of a share of any class of stock is hereinafter referred to as the "redemption price".

(3)     Notice of the intention of the corporation to redeem shares of any class of stock which is subject to redemption of the date and place for redemption shall be mailed at least 30 and not more than 60 days prior to the date to be redeemed at the last known address of the stockholder as shown by the records of the corporation, but no failure to mail such notice or any defect therein or in the mailing thereof shall affect the validity of the proceedings for such redemption except as to the holder to whom the corporation failed to mail such notice or whose notice was defective. Any notice mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the holder receives such notice.

(4)     On and after the date of redemption designated in such notice, each holder of shares called for redemption, upon surrender to the corporation at the place designated in such notice of the certificate or certificates for such shares, properly endorsed in blank for transfer in blank and bearing any necessary transfer tax stamps thereto affixed and canceled, shall thereupon be entitled to receive payment of the redemption price in cash. In case less than all shares represented by such surrendered certificate are redeemed, a new certificate shall be issued representing the unredeemed shares.

(5)     If such notice of redemption shall have been duly given, and if on or before the redemption date funds necessary for the redemption of the shares to be redeemed shall have been set aside so as to be and continue to be available therefor, then notwithstanding that any certificate representing any shares so called for redemption shall not have been surrendered, the dividends thereon shall cease to accrue from and after the date of redemption and all rights with respect to the shares so called for redemption shall forthwith after such redemption date cease, except only the right of the holder to receive the redemption price without interest. Any moneys so set aside by the corporation and unclaimed by the end of three years from the date fixed for such redemption shall revert to the general funds of the corporation.

4

(6)    All shares of the Class A Preferred Stock redeemed or otherwise acquired by the corporation shall be canceled and retired and shall not be reissued.

## D.    <u>Voting Rights</u>:

(1)    Each holder of shares of the Common Stock shall be entitled to one vote for each share standing in the name of such holder on the books of the corporation,

(2)    At any time when the corporation shall default in the payment of dividends on the Class A Preferred Stock for two consecutive quarterly dividend periods; or when the corporation shall default in the payment of any amount payable with respect to the redemption or liquidation of any shares of Class A Preferred Stock; or when the corporation shall default in the payment of principal or interest on any obligation for borrowed money, or in the performance of any of the terms or any instrument evidencing or relating to such obligation, and such default shall continue for more than the period of grace, if any, specified therein or if the corporation shall make an assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due or shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, or shall file any answer admitting the material allegations of a petition of bankruptcy filed against: the corporation in any such proceeding, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of the corporation or of all or any substantial part of the properties of the corporation, or the corporation or its directors or majority stockholders shall take any action looking to the dissolution or liquidation of the corporation; or if within 60 days after the commencement of an action against the corporation seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such action shall not have been dismissed or all orders or proceedings thereunder affecting the operations or the business of the corporation stayed, or if the stay of any such order or proceeding shall thereafter be set aside, or if within 60 days after the appointment without the consent or acquiescence of the corporation of any trustee, receiver or liquidator of the corporation or of all or any substantial part of the properties or if a Final Judgment shall be rendered against the corporation and if,

5

within 60 days after entry thereof, such judgment shall not have been discharged or execution thereof stayed pending appeal; or if, within 60 days after the expiration of any such stay, such judgment shall not have been discharged then and in every such event (hereinafter referred to as an "Event of Default") the holders of the Class A Preferred Stock voting separately as a class shall be entitled to elect the smallest number of directors of the corporation necessary to constitute a majority of the board of directors of the corporation, and the holders of the Common Stock voting separately as a class shall be entitled to elect the remaining directors of the corporation. However, if and when all Events of Default which may have occurred shall thereafter be cured, the holders of the Class A Preferred Stock shall then be divested of such voting power, and the Common Stock shall be entitled to elect all directors of the corporation voting together as one class, but always subject to the same provisions for the vesting of such voting power in the Class A Preferred Stock in the case of any future Event of Default. A special meeting of the Stockholders, at which the holders of the Class A Preferred Stock shall vote as a class and the holders of the common Stock shall vote as a class, shall be held within 10 days after the accrual of any such voting power, and upon notice similar to that provided in the By-Laws of the corporation for stockholders meetings, upon call by the holders of not less than 50% of the number of shares of the Class A Preferred Stock at the time outstanding or at the request in writing of the holders of not less than that of the number of shares of the Class A Preferred Stock at the time outstanding, addressed to the Secretary of the corporation at the principal business office of the corporation, in which case such Secretary shall call such meeting to be held. The holders of the Class A Preferred Stock and the Common Stock, respectively, shall be entitled to exercise such separate class voting power at a special meeting of stockholders called as aforesaid and at the next and succeeding annual meetings until termination of such separate class voting power. Whenever the right of the holders of the Class A Preferred Stock and Common Stock to elect directors by voting as separate classes has arisen, the terms of office of all persons who then may be directors of the corporation shall terminate upon the election of their successors at a meeting of the stockholders as above provided. Upon termination of such voting power at any time by reason of the curing of all Events of Default, the terms of office of all persons who may have been elected directors of the corporation by vote of the holders of the Class 'A Preferred Stock and the Common Stock voting as separate classes shall terminate at the next annual meeting of stockholders.

6

(3)    As long as any shares of the Class A Preferred Stock remain outstanding, the corporation shall not at any time without the consent of the Holders of at least a majority of the shares of the Class A Preferred Stock at the time outstanding, given in person or by proxy, either in writing or at a meeting called for that purpose, at which the holders of the Class A Preferred Stock shall vote separately as a class (unless the consent of the holders of a greater number of such shares shall be required by statute):

(i)    create, authorize or issue any additional class of stock ranking prior to or on a parity with the Class A Preferred Stock or increase the authorized amount of the Class A Preferred Stock or any additional class of stock ranking prior to or on a parity with the Class A Preferred Stock or create or authorize any obligation or security convertible into shares of stock of any class ranking prior to or on a parity with either the Class A Preferred Stock;

(ii)    amend, alter or repeal any provision of the Certificate of Incorporation or By-Laws of the corporation; provided, however, that the amendment of the Certificate of Incorporation of the corporation to create, increase or decrease the authorized amount of any class of stock ranking junior to the Class A Preferred Stock, or to increase or decrease the par value of any class of stock ranking junior to the Class A Preferred Stock thereof and may be effected by the affirmative vote of the holders of a majority of the stock of the corporation which is entitled to vote; or

(iii)    sell, lease or covey all or substantially all of the property or business of the corporation or a wholly-owned subsidiary of the corporation or consolidate or merge the corporation or any wholly-owned subsidiary of the corporation with any corporation or voluntarily liquidate, dissolve or wind up any wholly-owned subsidiary of the corporation or the corporation.

## E.    <u>Nontransferability of Preferred Shares</u>.

No holder of Class A Preferred Stock shall sell, assign, transfer, exchange, mortgage, pledge, grant a security interest in, or otherwise dispose of or encumber (any of the foregoing being herein referred to as a "Transfer") all or any part of its interest in the

7

Class A Preferred except to an affiliate of such holder unless consent to the Transfer is given by eighty percent (80%) of the holders of common stock then outstanding.

Certified as a correct and actual statement of the resolution adopted at the special meeting of the shareholders.

Dated this 1st day of December, 1998.


_____
**KURT S. MOYLAN**
President


_____
**MIKI MOYLAN**
Secretary

# TRANSFER AGREEMENT

## DECEMBER 4, 1997

This Transfer Agreement is entered into between Occidental Life Insurance Company of North Carolina ("OLIC"), a Texas domesticated life insurance company, and Kurt S. and Kaleo S. Moylan ("Principals"), individuals and organizers of NetCor Incorporated ("NetCor"), a corporation to be organized under the laws of Guam.

Attached as Exhibit A hereto and incorporated herein is an Agreement For Transfer And Assumption of Insurance Portfolio (the "Agreement) to be entered into between OLIC and NetCare Life and Health Insurance Company ("NLHIC"), a Guam domestic insurance company to be formed by NetCor.

## I. Formation of NLHIC and Assumption of OLIC Portfolio.

1. NetCor shall organize NLHIC as a life insurer with a Certificate of Authority in its domestic jurisdiction, with all necessary licenses to underwrite and issue life and health insurance policies in each of the jurisdictions where it is required to be licensed in order to assume all risks under all the policies covered in the Agreement;

2. The Articles of Incorporation and the Bylaws of NetCor and NLHIC shall be in form and substance satisfactory to OLIC and in the case of NLHIC approved by the Department of Revenue and Taxation of Guam, the Department of Commerce of the Commonwealth of the Northern Mariana Islands ("CNMI"), Insurance Commissioner of Guam, the Insurance Commissioner of the CNMI, and other relevant regulatory bodies;

3. Upon consummation of paragraph I(1) above, OLIC agrees to execute, and NetCor agrees to cause NLHIC to execute and deliver the Agreement substantially in the form attached.

4. OLIC and NetCor shall enter into a Subscription Agreement substantially in the form of Exhibit B attached to this Transfer Agreement relating to the issuance of Preferred Stock of NetCor to OLIC under the terms of the Agreement.

## II. Covenants of Principals.

1. Upon execution of this Transfer Agreement, Principals shall deposit with OLIC the sum of $50,000.00 which shall be retained by OLIC to reimburse OLIC for reasonable out-of-pocket expenses incurred from September 1, 1997, through completion of the transactions contemplated hereby. The unexpended balance of such expense deposit, if any, shall be returned by OLIC to Principals upon the first of the following to occur:

EXHIBIT $I$

       (a)     Principals or NetCor elect to withdraw from the Transfer Agreement by January 2, 1998;

       (b)     Guam's Insurance Commissioner either denies or fails to approve NLHIC's application for a certificate of authority or any preceding application requirement by June 30, 1998; or,

       (c)     Upon the Closing Date contemplated in the attached Agreement. OLIC shall provide NetCor or Principals with routine reports listing expenses reimbursed monthly or upon incurring same, as appropriate. In the event the initial $50,000.00 deposit is exhausted prior to Closing Date, NetCor or Principals will supplement the expense allowance with an additional deposit of $25,000.00.

2.     Principals shall complete their due diligence as to all matters regarding this Transfer Agreement and the Agreement and Principals shall cause NLHIC to file its application to form a domestic insurer in Guam by December 19, 1997.

3.     Principals shall cause NLHIC to file its Articles of Incorporation and other required documents with the Business License branch of the Department of Revenue and Taxation of Guam within 10 days after approval by the Guam Insurance Commissioner of the application to form a domestic insurer.

4.     Principals shall cause NLHIC to file its Application for a Certificate of Authority within 10 days after receipt of a Certificate of Incorporation.

## III.   Lost Opportunity

If, for any reason, subsequent to January 2, 1998, NetCor or NLHIC shall fail to take the action necessary to obtain a Certificate of Authority for NLHIC or otherwise fail to enter into and consummate the transaction contemplated by the agreement, then Principals shall pay to OLIC the sum of $90,000.00 as liquidated damages to compensate OLIC for its loss of time, energy and opportunity; provided, however, that OLIC shall not be entitled to recover any liquidated damages hereunder if Guam's Insurance Commissioner denies or fails to approve the Certificate of Authority or any preceding applications required by Guam law; provided, none of NLHIC, NetCor or their principals obtain such approval in connection with this or any other business enterprise.

IN WITNESS WHEREOF, the undersigned have set their hands as of the day and year first above set forth.

NETCOR INC.

OCCIDENTAL LIFE INSURANCE
COMPANY OF NORTH CAROLINA

By _____
KURT S. MOYLAN, Principal

By _____
President

By _____
KALEO S. MOYLAN, Principal

MS978122.B

# TRANSFER AGREEMENT

## FEBRUARY 25, 1997

This Transfer Agreement is entered into between Occidental Life Insurance Company of North Carolina ("OLIC"), a Texas domesticated life insurance company, and NetCor Inc. Holding Company ("NHC"), a Guam corporation.

## I.    RECITALS:

A.    Moylan's Insurance Underwriters, Inc. ("MIU") has expressed its interest to purchase and OLIC has indicated its willingness to sell its West Pacific portfolio of life and health insurance policies;

B.    MIU has caused to be formed NetCor Inc. Holding Company ("NHC") and will contribute its agreement in principle with OLIC to NHC in exchange for certain shares of Common Stock in NHC;

C.    NHC is in the process of forming NetCare Life and Health Insurance Company ("NLHIC") with all necessary licenses to underwrite and issue life and health insurance policies in each of the jurisdictions where it is required to be licensed in order to assume all risks under all the policies such as those being sold by OLIC under the terms and conditions set forth in the Agreement for Transfer and Assumption of Insurance Portfolio (the "Agreement") attached thereto as Exhibit A;

D.    The Articles of Incorporation and the Bylaws of NHC and NLHIC shall be in form and substance satisfactory to OLIC and in the case of NLHIC shall be approved by the Department of Revenue and Taxation of Guam, the Department of Commerce of the Commonwealth of the Northern Mariana Islands ("CNMI"), the Insurance Commissioner of Guam, the Insurance Commissioner of the CNMI, and other relevant regulatory bodies;

E.    Upon consummation of paragraphs A-D above, OLIC agrees to execute, and NHC agrees to cause NLHIC to execute and deliver the Agreement substantially in the form attached hereto as Exhibit A with such changes as NHC, NLHIC and OLIC shall agree;

F.    OLIC and NHC shall on the Closing Date under the Agreement enter into a Subscription Agreement substantially in the form of Exhibit B attached to this Transfer Agreement relating to the issuance of Preferred Stock of NHC to OLIC;

G.    OLIC delivers herewith to NHC a certified copy of a resolution of its Board of Directors authorizing this transaction and authorizing the appropriate officer or officers to act in behalf of OLIC to consummate the transactions contemplated hereby; and

EXHIBIT J

H.     This Transfer Agreement entered into between NHC and OLIC shall supersede any and all previous agreements, whether written or oral, and shall constitute a novation of any and all agreements previously executed on behalf of NHC by its principals, incorporators, or other authorized agents.

## II.     EXPENSES.

1.     NHC has deposited with OLIC the sum of $50,000.00 which upon execution and delivery of this Transfer Agreement shall be retained by OLIC to reimburse OLIC for reasonable out-of-pocket expenses incurred from September 1, 1997, through completion of the transactions contemplated hereby. The unexpended balance of such expense deposit, if any, shall be returned by OLIC to NHC upon the first of the following to occur:

(a)     Guam's Insurance Commissioner either denies or fails to approve NLHIC's application for a certificate of authority by June 30, 1998;

(b)     On the Adjustment Date contemplated in the Agreement.

2.     OLIC shall provide NHC with routine reports listing expenses reimbursed monthly or upon incurring same, as appropriate. In the event the initial $50,000.00 deposit is exhausted prior to Closing Date, NHC will supplement the expense allowance with an additional deposit of $25,000.00.

3.     NHC shall use its best efforts to obtain the Certificate of Authority for NLHIC by April 30, 1998.

IN WITNESS WHEREOF, the undersigned have set their hands as of the day and year first above set forth.

NETCOR INC. HOLDING COMPANY

OCCIDENTAL LIFE INSURANCE
COMPANY OF NORTH CAROLINA

By _____
President

By _____
Chairman

MS978122.MTC

NetCare Life & Health
Insurance Company

Five Year Business Plan

July 15, 1998

## The Company

NetCare Life & Health Insurance Company ("NetCare" or the "Company") was organized as the wholly-owned subsidiary of its holding company parent, NetCor Incorporated ("Holdings") in February, 1998 to acquire the individual life and lump sum cancer insurance portfolio of Occidental Life Insurance Company of North Carolina ("OLIC") issued and maintained (the "OLIC Portfolio") in Guam, the Federated States of Micronesia, the Commonwealth of Northern Mariana Islands, Republic of Belau and the Marshall Islands (the "Territory"). NetCare received its Certificate of Authority ("COA") as the first Guam domesticated life insurer on April 2, 1998 and its COA to operate in the CNMI on June 18, 1998. The Company has applied for a 20 year tax holiday from taxes on gross receipts, and net income under Public Law 23-109, and expects the grant of qualification for this treatment to be made effective in November 1998. (See Exhibit 7 and "Taxation").

All of the issued and outstanding shares of capital stock of the Company are owned by Holdings which has contributed to the Company its rights under the Transfer Agreement (Exhibit 1) to acquire on October 1, 1998 the OLIC Portfolio in exchange for $2.0 million of Preferred Stock in Holdings. On October 1, 1998 after giving effect to the acquisition of the OLIC Portfolio the balance sheet of NetCare will appear as set forth immediately below, subject to adjustment (the "Adjustment") to the OLIC Portfolio pursuant to the Agreement for Transfer and Assumption of Insurance Portfolio entered into between the Company and OLIC as of July 15, 1998. (the "Agreement") (Exhibit 2) The Adjustment will be made before December 31, 1998 and will affect the number of policies in force, net assets transferred, policy liabilities etc. that made up the OLIC Portfolio as of September 30, 1997 (the "Reference Date") adjusted from the Reference Date to September 30, 1998.

EXHIBIT 

1

NetCare Life and Health Insurance Company
Assets, Liabilities, And Policyholders Surplus
Proforma As Of October 1, 1998
(After giving effect to transfer of the OLIC Portfolio and
investment of $7.0 cash from Holdings)
(See Also Schedule C)

| Assets | | Liabilities | |
|---|---|---|---|
| Cash and short term investments | $11,100,000 | Aggregate policy reserves | $5,500,000 |
| Policy loans | 1,400,000 | | |
| | | Total liabilities | 5,500,000 |
| | | Stockholders equity | |
| | | Common Stock | 7,000,000 |
| Total cash and invested assets | $12,500,000 | Total liabilities and stockholders equity | $12,500,000 |

  The policies reported in force on the date the Notice of Transfer is mailed will also be subject to reduction and adjustment by reason of any policyholders refusing to accept transfer of their policy from OLIC to NetCare as will be requested by Notice of Transfer (Exhibit 3) expected to be mailed to policyholders by OLIC and the Company not later than August 1, 1998. For an analysis and summary of the OLIC Portfolio subject to the Adjustment see Schedule A. The Company and OLIC have appointed Moylans Insurance Underwriters their agent to manage the process of sending the Notice and obtaining policyholder consent to the Transfer. NetCare has agreed for a period of one year to hold OLIC harmless from any liability to policyholders who claim their consent to the Transfer was not validly and legally obtained and who attempt to hold OLIC liable under their policy.

**Current Operations**

  Over the 18 month period from January 1, 1997 through June 30, 1998 OLIC has not generated any business in the Territory. Both NetCare and OLIC in retrospect see this lapse as a mistake and commencing July 1, 1998 OLIC has consented to allow Moylans Insurance Underwriters, as general agent, to solicit business for insurance under the following policies from individuals in the Territory who will execute and deliver to

2

Case 1:04-cv-00041  Document 1-4  Filed 09/20/2004  Page 15 of 40
03/10/99 WED 13:04 [TX/RX NO 6153]

OLIC and the Company at the time of their application the written acceptance attached to the Notice of Transfer.

> Lump Sum cancer (Schedule A-1)
> Excess Interest Whole Life (Schedule A-2)
> Universal Life Performer (Schedule A-4)

The claims history on the OLIC Portfolio has been as follows: There have been claims with an average "paid amount" of $28,600. Of these claims, only three were for an amount greater than $100,000. Here's a general breakdown of loss experience 1994 through 1996 on the OLIC Portfolio:

| Claim Size (000's) | # Claims | Paid Amount |
|---|---|---|
| $ 0-25 | 90 | $ 1,019,328 |
| 26-50 | 17 | 610,096 |
| 50-100 | 13 | 926,348 |
| >100 | 3 | 960,348 |
| Total | 123 | 3,516,300 |

Then from October 1, 1998 the Company will continue its ongoing operations.

**Ongoing Operations**

NetCare will commence marketing under its own name on October 1, 1998. NetCare's new levelized commission structure with Moylans Underwriters plus a repricing of the old OLIC Performer and Lump Sum Cancer products should make this business actuarially even more profitable than under the replaced OLIC policies. The following will be NetCare's stable of products at start up.

> Ultimate Life Performer with account bonus riders
> Lump Sum Cancer
> Excess Interest Whole Life with Annuity and other Riders
> 10-20 year Term Policy and 30 year mortgage protection
> Group Life

3

The financial state of NetCare as of December 31, 1998 will reflect on a proforma basis:

    (a) cash injections aggregating $7.0 million ($2.0 million of which is already contributed);

    (b) Acquisition and Adjustment of the OLIC Portfolio and its Assets;

    (c) Issuance of new policies through December 31, 1998; and

    (d) Conduct of operations from October 1 through December 31, 1998.

The Company will be required to complete and file its Annual Report for 1998 and will do so in compliance with the rules and guidelines of the National Association of Insurance Commissioners. A proforma and basically contingent example of what certain key pages in the Company's "Blue Book" for 1998 might be expected to look like based upon current projections are attached in Schedule B.

The first full year of NetCare's operations will be 1999, and that year's sales projections and budgeted expenses are set forth below with a five year growth projection. Detailed assumptions upon which these projections are based are set forth in Schedule C attached hereto.

[Intentionally left blank]

4

# NetCare Life and Health Insurance Company
## Of Guam
## Statutory Basis
## Proforma Income Statement
## In 000's

|  | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 |
|---|---|---|---|---|---|
| INCOME |  |  |  |  |  |
| Premium Income | 6,872 | 13,560 | 15,205 | 16,888 | 19,699 |
| Net Invest Income | 841 | 1,061 | 1,336 | 1,629 | 1,988 |
| TOTAL INCOME | 7,713 | 14,621 | 16,541 | 18,517 | 21,687 |
| BENEFITS AND EXP |  |  |  |  |  |
| Policy Benefits | 3,019 | 6,919 | 7,455 | 7,977 | 9,310 |
| Increase in RSV | 1,130 | 1,883 | 2,489 | 3,144 | 3,862 |
| Commissions | 818 | 1,879 | 2,396 | 2,769 | 3,135 |
| Gen Exp-ACQ | 200 | 248 | 298 | 323 | 373 |
| Software Amount | - | - | - | - | - |
| Gen Exp Other | 800 | 903 | 995 | 1,021 | 1,084 |
| Total Ben. Exp | 5,967 | 11,832 | 13,633 | 15,234 | 17,764 |
| NET INCOME | 1,746 | 2,789 | 2,907 | 3,283 | 3,923 |
| CHANGE IN SURPLUS |  |  |  |  |  |
| Beg CAP. Surplus | 7,259 | 9,005 | 11,794 | 14,066 | 16,244 |
| Net Income | 1,746 | 2,789 | 2,907 | 3,326 | 3,923 |
| Dividends |  |  | (635) | (1105) | (792) |
| Other |  |  |  |  |  |
| CHANGE IN CAP/SUR | 1,746 | 2,789 | 2,272 | 2,178 | 3,131 |
| ENDING CAP.SUR | 9,005 | 11,794 | 14,066 | 16,244 | 19,375 |

## Proforma Balance Sheet
### Statutory Basis

|  | 12/31/99 | 12/31/00 | 12/31/01 | 12/31/02 | 12/31/03 |
|---|---|---|---|---|---|
| ASSETS |  |  |  |  |  |
| Bonds, Short Term | 14,265 | 18,695 | 23,179 | 28,181 | 34,807 |
| Policy Loans | 1,610 | 1,852 | 2,129 | 2,449 | 2,816 |
| Cash |  |  |  |  |  |
| EDP Equip | - | - | - | - | - |
|  |  |  |  |  |  |
| TOTAL ASSETS | 15,875 | 20,547 | 25,308 | 30,630 | 37,623 |
|  |  |  |  |  |  |
| Liabilities |  |  |  |  |  |
|  |  |  |  |  |  |
| Reserves | 6,870 | 8,753 | 11,242 | 14,386 | 18,248 |
|  |  |  |  |  |  |
| TOTAL LIABILITIES | 6,870 | 8,753 | 11,242 | 14,386 | 18,248 |
|  |  |  |  |  |  |
| Capital & Surplus |  |  |  |  |  |
|  |  |  |  |  |  |
| Paid in Capital Common | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 |
|  |  |  |  |  |  |
| POL Surplus | 2,005 | 4,794 | 7,066 | 9,244 | 12,375 |
|  |  |  |  |  |  |
| TOTAL CAPITAL & SURPLUS | 9,005 | 11,794 | 14,066 | 16,244 | 19,375 |
|  |  |  |  |  |  |
| TOTAL LIABILITIES AND CAPITAL | 15,875 | 20,547 | 25,308 | 30,630 | 37,623 |

Notes: This is proforma assuming all the OLIC Portfolio in place on September 30, 1997 is transferred.

6

The assumptions set fourth in Schedule C disclose the Company plans to market its life and cancer products through Moylans Insurance Underwriters to companies (payroll deduction), banks (account deduction) and to promote its Group Cancer and Life products. As set forth in more detail below under "Competition" its main competition will be in the individual life, payroll deduction, business where margins are thinner. It will offset this by working with Moylans on a levelized omission basis which will give the Company an advantage over its competition. The Company's Universal and Excess Interest Whole Life products sold by Moylans through banks will compete primarily with savings plans offered by banks and margins are expected to be better on these products. Moylans and the Company's unique relationships with certain banks in the Territory will be used in this effort and are expected to give the Company an advantage over its competition.

## Marketing & Sales

The selling effort of the Company is in the hands of Moylans Insurance Underwriters who built the OLIC Portfolio in the Territory. Kaleo Moylan, Director and Executive Vice President-Marketing, is also Regional Manager of the Life Insurance Division of Moylans Insurance Underwriters, the Company's general and exclusive Agency. Moylans will sell through 20 sales employees and a network of 14 individual agents which it has recruited and trained. It is expected this current selling force will increase to an aggregate of 50 by the end of 1999 and to as much as 100 by the year 2003.

Marketing will focus on fitting the right products to each of the following channels of distribution:

Payroll Deduction
Private Sector
Government
Bank/Assurance
Cancer-Lump Sum
Group Life & Health
Private Sector
Government

Customer service is the Achilles heel of many of the life insurers doing business in the Territory because of the time and date differences to the U.S. and Europe. As a full

service indigenous underwriter NetCare will be able to service employers, individual applicants and policyholders on site from the moment of application to enrollment and throughout the life of the policy. The underwriting function, issuance of policies, loan administration and claims will be handled at NetCare's home office on Guam, utilizing a modern administrative system and a staff made up of highly trained and experienced customer service personnel.

Currently the time elapsed on a universal life policy requiring medical evaluation, from signing of the application to issuance of the policy and collection of the first premium, averages over 60 days and receipt by such policies of the employee can and does often take over 120 days. Thus the policyholder does not get his policy until he or she has made up to five bi-weekly premium payments. Employers don't like this and neither do the employee policyholders. NetCare expects to close these times to 45 and 15 days in October and to 30 days with no policy receipt gap when in full operation by March 31, 1999. Policy loans are currently processed out of Raleigh in 21 days, a time period which NetCare expects to reduce to 7 days. OLIC claims are currently processed out of Raleigh in 60 days on the average and this period will be reduced by March 31, 1999 to 30 days.

A principal focus of NetCare management will be in this area of policyholder service. Moylans is therefore going to be enabled to sell adapted and profitable life and health policies along with superior (almost unheard of) policy customer service.

## Group Life – The Opportunity

The opportunity to write group life business in the region is virgin. Only three companies currently market a group life plan in the area and out of those three only two mildly service the islands private sector.

Moylan's Insurance has played a major role in the awareness for group life benefits in the region. In fact, it developed the market for two of the three carriers mentioned above. The area of significant development was and continues to be the government sector. Since 1986 the Government's of Guam, the Commonwealth of the Northern Marianas, Federated States of Micronesia and the Republic of the Marshall Islands have all placed their group life insurance programs out for bid. The groups as a whole represent over 27,000 government employees.

Of the various companies, which have held the government group life contracts, Moylan's has represented them all. Moylan's success in this area lies in the fact that it has the personnel and knowledge on what it takes to successfully bid on these types of government group contracts.

8

The contracts with the governments are usually for three-year periods with a right to renegotiate rates after the second policy year. The average annual premium currently collected for each of the government groups is as follows: Government of Guam $4 million; Government of the CNMI $2 million; Government of the FSM $1.5 million; the Government of the Marshall Islands $600,000 for a total of $8 million in potential group life annual premium.

The government's group life loss ratio has historically been between 79% and 83%. While in the private sector the loss ratio averages 50%.

Moylan's Insurance has and continues to handle the administration and marketing of the group life program. Currently and without much marketing effort the company has placed on its books $500,000 in annualized premium representing various commercial accounts. Moylan's would like to place that business with NetCare.

Given today's climate for more employee benefits and greater access to information, customer expectations can best be met with a domestic company such as NetCare. As set forth above under "Marketing", Moylans primary selling point has been the ability to settle claims within forty-eight (48) hours upon proper receipt of all documentation. Pricing, underwriting and fast claims settlement is the key to success. Past experience has shown that carriers who try to administer these functions from off island defeat their own marketing efforts. Local administration is important, and this is where NetCare expects to make its most dramatic impact.

9

## The Market

The following table shows total population and income statistics for the Pacific Island market.

| (1)<br>Area | (2)<br>Population<br>(000's) | (3)<br>Per Capita<br>Income | (4)<br>(2) x (3) |
|---|---|---|---|
| Guam * | 160 | $ 20,000 | $3,200,000,000 |
| New Caledonia II | 197 | 15,000 | 2,955,000,000 |
| French Polynesia II | 230 | 14,000 | 3,220,000,000 |
| CNMI* | 63 | 8,800 | 50,400,000 |
| PNG III | 4,142 | 6,000 | 24,852,000,000 |
| FSM* | 109 | 1,900 | 207,100,000 |
| FIJI II | 800 | 2,300 | 1,840,000,000 |
| SAMOA II | 60 | 4,300 | 258,000,000 |
| PALAU* | 17 | 6,000 | 102,000,000 |
| RMI* | 10 | 1,600 | 16,000,000 |
| | | | |
| Totals | $5,781 | $80,900 | $36,730,500,000 |

The markets identified with an asterisk are those in which NetCare is currently in business. Those marked "II" will be entered projected in 2001 and those marked "III" in 2002 or 2003.

Cultural and geographical differences make any extrapolation of these statistics to sales and other business projections difficult and of limited value. Just as a macro comparison, the totals of column (4) above are compared to the percentages set forth below for to the Philippine Islands and Indonesia. To the extent that Column (4) is meaningful note that the Island Pacific Territory is one-half the number for the Philippines, and that PNG stands out alone in second place. On the other hand the per capita amounts of Guam, the CNMI, French Polynesia and New Caledonia may make wealth accumulation products more immediately marketable.

| (1)<br>Region | (2)<br>Population | (3)<br>Annual per Capita<br>Income | (4)<br>(2) x (3) |
|---|---|---|---|
| Indonesia | 198,000,000 | $24.00 | $4,752,000,000 |
| Philippines | 74,700,000 | $832.00 | $62,150,400,000 |
| **TOTAL** | **272,700,000** | | |

## Administration and Conversion

The OLIC Portfolio is currently administered on the "Life 70" system by OLIC out of Raleigh, N.C. This will cease as of the close of business on September 30, 1998. "Life 70" is a maintenance system designed for large portfolios and as such not the Company's choice of administration computer system.

The Company has been considering systems into which to convert the OLIC Portfolio and to become the Company's ongoing administration system. One of these is an Oracle based system (CIS) developed by Advanced Digital Services of Raleigh, N.C. The Company has investigated the IBM licensed "LifePro" system, also the "PolicyLink" system of the Leverage Group, the "Apex" system and several other systems in general use both inside and outside the continental U.S. and Europe, before choosing CIS. The cost of acquisition and conversion has been estimated and budgeted at $800,000. The maintenance fee under the license will be about $5,000 monthly from one year after the point of installation (probably August 1999).

The OLIC Portfolio will be converted to the new system on site in Raleigh, N.C. It is assumed for purposes of this Plan that conversion will not be completed before December 1, 1998. A Delaware company will be organized outside the Company and not controlled by OLIC ("NewCo"). NewCo will be initially staffed by personnel familiar with the Portfolio and the both "Life 70" and the new system. A budget for NewCo has been approved by the Company's Board of Directors and will be funded by loans to NewCo by Moylans Insurance Underwriters.

NewCo will be appointed the Company's third party administrator under agreement (the "TPA Agreement"). The TPA Agreement will be priced to cover the expense of personnel and equipment for continuing administration of the Portfolio on Life 70 and working with the provider through conversion of the Portfolio to the new

system. Newco will continue to administer these policies and all new business of the Company at cost plus 10% under the TPA Agreement after October 1, 1998 and following conversion. Newco will move its operations to Guam as soon as possible, probably in the first quarter of 1999, and NetCor Holdings will be obliged to acquire NewCo at this point for an amount equal to its liabilities. (See below) As soon as possible the Company will establish an internet line communication directly with Newco personnel in Raleigh, N.C. which will be aimed at giving NetCare control over its business and allowing Guam service representatives to function as if the system were fully operational on Guam within NetCare. The TPA Agreement with Newco has the advantage of significant cost savings over another third party administration arrangement while allowing for a relatively seamless transfer of the function to NetCare during and after conversion from Life 70. Using this arrangement the Company can ease into full administration responsibility while policyholders are serviced by personnel who know them and are familiar with both the system and the business.

The total cost of the acquisition and conversion of the administration system will be capitalized in NewCo. License rights to the chosen system will be owned by NewCo, which is capitalized by a loan commitment and credit facility provided by Moylans Insurance Underwriters and promissory notes in the aggregate principal amount approximating $800,000. At some point during 1999 NetCor Holdings will purchase NewCo for the value of the Notes plus any other liabilities of NewCo not expected to exceed $30,000.

## Taxation

NetCare has applied for tax relief from the Guam Economic Development Authority under Public Law 23-109 See Exhibit #7.

> Income Tax
> Gross Receipt Tax
> (On premiums and investment income)

Based upon projected premium levels and the assumptions set forth in Schedule C, as summarized in the five year projected comparative statement on page 5 above, the effect of the relief applied for on NetCare's cash flow over the five years 1999 – 2003 is estimated as follows:

12

| Year | With Tax Relief cash generated before Income Tax IBID | No Tax Relief after tax cash available to business PAT | Compound effect of savings if invested at 6% |
|---|---|---|---|
| 1999 | 2,876 | 2,258 | 781 |
| 2000 | 4,672 | 3,668 | 1,196 |
| 2001 | 4,762 | 3,738 | 1,150 |
| 2002 | 5,322 | 4,178 | 1,213 |
| 2003 | 6,993 | 5,490 | 1,503 |
| NET SAVINGS OVER 5 YEARS | | | 5,844 |

## Outsourcing of Staff Functions

The following functions will be out-sourced.

- Underwriting of non-conforming risks
- Actuarial services and related issues of product development
- Auditing (The Company will have no internal auditor)
- Investment management and NAIC accounting for investments.
- Sales (Moylans)

This will allow the Company working with NewCo to concentrate on policyholder service and administration, which it expects will make it the insurer of choice throughout the Territory. NewCo may be maintained as a separate entity in order to allow it to function as TPA provider to other insurers, earning income and reducing overall costs of providing administration services to the Company.

## Reserves and Risk Based Capital Calculation

The Company's reserves will be certified as adequate by the firm of Milliman & Robertson as of December 31, 1998 and thereafter. Also the responsible actuary of OLIC will certify as to the adequacy of those supporting the OLIC Portfolio as of September 30, 1998 and as modified by the Adjustment. In the event the Company's sales operations or claims experience over the years 1999 through 2003 exceed projections, new and additional capital may need to be raised. To cover this contingency all those subscribing to shares of Holdings will have the opportunity to acquire their proportionate share of ownership of Holdings or increasing same if their fellow shareholders demur.

13

A risk based capital calculation according to NAIC standards ("RBC") has been projected based upon the sales projections, loss experience and reserves available as set fourth above as of December 31, 1998 and each successive year through 2003:

## Risk Based Capital

|  | 1998 | 1999 | 2000 | 2001 | 2002 | 2002 |
|---|---|---|---|---|---|---|
| TOTAL RBC | 979,165 | 1,317,520 | 1,830,490 | 2,094,405 | 2,359,365 | 2,647,675 |
| RATIO-CAPITAL/RBC | 741.35% | 683.48% | 644.31% | 672.00% | 688.00% | 731.77% |

See Schedule D for backup calculations.

**Relationships**

The Company in reality is a joint venture involving in the first instance the principals of Moylans Insurance and OLIC, to which is added the primary investor budgeted to come in on or before October 1, 1998. OLIC will be taken out through redemption of its Preferred Stock over the period 2000-2003 (See Exhibit 9). The Company expects all voting shareholders will enter into a Shareholder Agreement the substance of which will provide, inter alia, for assigning responsibility for and operational control over each of the following:

1. Allocation of responsibility for day to day operations, including
   (a) product development and pricing
   (b) underwriting policy
   (c) administration
   (d) investments
   (e) actuarial
   (f) corporate governance
   (g) statutory & NAIC compliance
   (h) reinsurance

2. Treatment of Business consolidation, acquisition, sale and purchase of assets, corporate structure and matters normally left to shareholders.

3. Exit means for shareholders in the event of fundamental change or disagreement.
   (a) sale or other change in control of shareholder.
   (b) incompatibility.

14

(c) need for substantial additional capital or liquidity.
(d) default.

4.    Dividend Policy

## Reinsurance Treaty

The OLIC Portfolio is currently reinsured for individual risks in excess of $100,000. OLIC has notified each reinsurer of the pending sale of the Portfolio and asked each whether they were willing to acknowledge a novation of the existing treaty from OLIC to the Company. There is no treaty cession business in the Portfolio; all reinsurance is self administered, the following shows the allocation of reinsurance for the portfolio as of June 30, 1998:

| Reinsurer | Policy Count | Ceded Risk Amount |
|-----------|--------------|-------------------|
| Crown Life | 4 | $ 374,430 |
| M&G (Swiss Re) | 14 | 1,502,151 |
| Swiss Re | 16 | 2,151,676 |
| Phoenix | 67 | 8,018,279 |
| RCH | 10 | 1,282,798 |

The Assumption Agreement with OLIC (See Exhibit 2.) provides any recapture fees raising out of termination by the Company of these treaties will be for the Company's account. The Company will be in contact with each of these reinsurers to determine their interest in continuing and to avoid any recapture.

The intent of the Company's long term reinsurance program is to sufficiently protect it against adverse experience without being too costly. With this goal in mind, the Company has instituted a planned program that approaches various types of business with different approaches, as follows:

For individual life policies, the block of business that the Company has assumed from Occidental Life Insurance has exhibited a history of numerous small claims, with very few large claims. With the history in mind, it was decided that the Company would reinsure claims only over $100,000 on individual policies, with substandard cases handled on a facultative basis. This should protect the Company against adverse experience while allowing it to maximize its return on this line.

For Group and Credit life policies, current thinking is that a "stop-loss" approach would be appropriate, with varying loss ratios for the different types of business. For Government groups, a loss ratio of 85% is planned, compared to a 70% loss ratio for private groups. For Credit life, the ratio will be 30%. Once the Company reaches these loss ratios, all further claims for that year would be 100% reinsured.

The Cancer business will be treated in essentially the same manner as the Group and Credit life blocks, except that a loss ratio of 55% will be targeted for this block. Once this ratio is reached, all claims will be 100% reinsured.

## Officers and Directors

Subject to the Shareholders Agreement (See "Relationships") the NetCare directors can follow the officers and directors of Holdings which are planned to be as follows:

Nine directors
     Five to be chosen by investor
     Four chosen by Moylans, namely
          Kurt S. Moylan
          Kaleo S. Moylan
          M.V. Pangilinan
          James W. Lillie, Jr.

Officers

| | |
|---|---|
| Chairman | Kurt Moylan |
| President and CEO | (Investor choice) |
| Executive Vice President | Kaleo S. Moylan |
| Vice President | James Hoss |
| Secretary | Kaleo S. Moylan |
| Treasurer | (Investor choice) |
| Chief Actuary | (Investor choice) |

## General Agency Agreement

Moylans Insurance Underwriters have entered a mutually exclusive long term Agreement with the Company to sell NetCare policies. Commissions are on a level basis as set forth in more detail in the assumptions making up Schedule C. Moylans will have the right to terminate this Agreement under the situations outlined on pages 14 and 15 above at paragraph 3 which will be set forth in the Shareholders Agreement and will terminate automatically in the event of certain other events set forth therein. This Agreement will remain in force so long as these specified events have not occurred.

16

## The Holding Company

NetCor is a holding company and the parent of NetCare. As such it is the sole source of NetCare's initial capital which may need to be augmented from time to time to maintain capital and reserves.

## Description of Securities (See Exhibits 8 and 9)

Holdings has two classes of stock authorized. Common Stock, 1,050,000 shares of $10.00 par value per share and Preferred Stock divided into Class A Preferred Stock, 25,000 shares of $100.00 par value per share and other series without the rights of the Class A Preferred, 20,000 shares of $100.00 par value per share.

The total Common Stock authorized is $10,500,000 of which $3.0 million is issued to Moylans and of which another $7.0 million is proposed to be issued to new investors. (See "Capitalization" below.)

The Class A Preferred will all be issued to OLIC in payment for the Portfolio transferred to NetCare, Holdings wholly-owned subsidiary.

### Common Stock

Each holder of shares of Common Stock is entitled to one vote for each share for the election of directors and, subject to the rights of holders of the Class A Preferred Stock, on matters requiring the vote of Holdings stockholders. Common Stockholders may receive dividends subject to the prior rights of holders of Class A Preferred.

### Class A Preferred

1. Entitled to receive dividends of $6.00 per share per annum, which are cumulative, and no dividend may be paid on Common or any other stock unless and until all dividends on Class A Preferred are current.
2. Prior distribution rights upon liquidation
3. Must be redeemed at par plus accrued dividends:
   5,000 shares on or before September 30, 2001;
   10,000 shares on or before September 30, 2002; and
   the balance of any shares outstanding on or before September 30, 2003;
   and may be so redeemed in whole but not in part by Holdings anytime upon notice.

4. Holders of Class A vote as a class if dividends or redemption payments are ever in arrears for two quarters or in the event of other enumerated events such as liquidation (See Articles of Incorporation at Section D.)
5. So long as any shares of Class A are outstanding Holdings may not without the vote of the Class A holders:
    (a) Issue securities with, or create rights under the Articles of Incorporation regarding, any shares of Preferred or other securities with equal or senior rights to the Class A Preferred;
    (b) sell or reconstruct the Company; or
    (c) increase number of authorized shares of Class A Preferred.

## Capitalization

The NetCor Holdings balance sheet on a pro forma basis and according to GAAP as of October 1, 1998 might look like this:

| Assets (millions) | | Liabilities | |
|---|---|---|---|
| Cash | $ 2.0 | Promissory Note Due 1998 | $ 1.0 |
| Investment in subs (including goodwill) | $11.0 | Preferred Stock | 2.0 |
| | | Capital Stock | 10.0 |
| Total | $13.0 | | $13.0 |

18

Notes:

1.  Cash contributions to Holdings are budgeted at $9.0 million, $2.0 of which was paid in on February 20, 1998 by Moylans Insurance Underwriters ($1.0 million for Common Stock and $1.0 million in the form of a loan) and $7.0 is budgeted to come in at closing of the subscription by the new investor. $7.0 million will be contributed down to NetCare and $2.0 retained at the holding company.

2.  The $11.0 million investment in subsidiaries is made of cash and short term investments. This will increase sometime in 1999 with the acquisition of NewCo for an estimated $800,000 to $1.0 million.

3.  Preferred Stock issued to OLIC.                                              $  2.0

4.  Common Stock issued as follows:
    To New Investor for cash                                                      $  7.0
    To Moylans for cash                                                              1.0
    To Moylans for value added in setting up NetCare, getting tax treatment and
    transferring the opportunity to acquire the OLIC Portfolio and all
    approvals and consents                                                           2.0

5.  Promissory Note, due 1998 to Moylans Insurance Underwriters                      1.0

    Total                                                                        $13.0

NOTE: See Exhibit 10 for Chart of Corporate Structure

**Regulatory Compliance**

NetCare is required to comply with the insurance laws of Guam and the CNMI in addition to meeting published guidelines of the National Association of Insurance Commissioners.

The Board of Directors will appoint a Compliance Officer qualified to monitor and maintain compliance with all laws, rules and regulations. In the financial area the chief financial officer will be responsible for the timely and accurate filing of financial information with the regulatory authorities and to meet the NAIC standards.

Case 1:04-cv-00041    Document 1-4    Filed 09/20/2004    Page 32 of 40

All agreements covering TPA's, investment management and actuarial services are at arm's length dealing with third parties.

## Dividends

NetCare does not intend to enter into any management or pooling arrangements which would require filing with the regulators. No dividends, ordinary or extraordinary, are planned during the five years of this Business Plan, except as may be necessary to redeem the Class A Preferred Stock issued by Holdings. This contingency is incorporated into the financials appearing elsewhere in this Plan.

It is a policy of most insurance regulators and rating agencies that an insurance holding company should pay cash dividends on common stock out of income available over the past year and only if prospective earnings retention is consistent with the enterprise's expected future needs and financial condition. Insurance holding companies should not maintain a level of cash dividends that undermines its ability to serve as a source of financial strength to its insurance subsidiaries. Holdings intend to operate by these principles.

**Exhibits**

| | |
|---|---|
| #1 | Transfer Agreement |
| #2 | Agreement for Transfer and Assumption of Insurance Portfolio |
| #3 | Notice of Transfer |
| #4 | TPA with NewCo (to be negotiated) |
| #5 | General Agency Agreement with Moylans Insurance (to be negotiated) |
| #6 | Reinsurance Treaty (to be negotiated) |
| #7 | Notice of Application to GEDA |
| #8 | Articles of Incorporation of NetCare |
| #9 | Articles of Incorporation of NetCor Holdings |
| #10 | Corporate Structure Chart |

**Schedules**

A      Analysis and Summary Description of OLIC Portfolio as of September 30, 1997.
-  1   Lump Sum Cancer Policy Form
-  2   Excess Interest Whole Life Policy Form with Riders
-  3   UL Performer Policy Form with Riders
-  4   Other Policies

B      Proforma Blue Book Pages
C      Assumptions underlying Financials
D      RBC back up

** PAGE.23 **

# Capitalization + Structure
## Netcor Holding Company System
(in millions of dollars)

**NETCOR**

10-1-98

CASH ON HAND 2.0
INVESTED IN SUBS 11.0

Moylans
Newco 2
SYSTEM
$800
NOTE $800

Moylans 3
Tax Consultants

Investor 2
Reinsurance

commissions
ceding commissions
Sales
commissions
TPA

**Moylans'**

| | | | |
|---|---|---|---|
| CASH | 2.0 | Liabilities | |
| VALUE | 2.0 | NOTE due 98 | 1.0 |
| OLIC pfd | 2.0 | Preferred | 2.0 |
| Investor' | 7.0 | Common | 10.0 |
| | 13.0 | | 13.0 |

**NETCARE**

| | | | |
|---|---|---|---|
| CASH CONTRIBUTION | 7.0 | RESERVES | 5.5 |
| OLIC Portfolio Assets | 5.5 | Capital Stock | 7.0 |
| | 12.5 | | 12.5 |

# Netcor Inc. Holding Company

**Via Facsimile**

1 October 2003

Ms. Darla Schaffer
Vice President and Controller
Occidental Life Insurance Company
425 Austin Avenue
Waco, Texas 76701

RE: September 30, 2003 – Quarterly Dividend – Netcor Inc. Holding Company –
    Payable to Holders of Class A Preferred Stock

Dear Darla,

This is to inform you that, effective June 30, 2003 the Board of Directors has
declared, payable to all holders of Class A Preferred Stock issued by the
corporation, a dividend of $1.50 per share, to all holders of record as of
September 15, 2003. As of that date, Occidental Life Insurance Company of
North Carolina, is the only holder of record of Class A Preferred Stock, holding
20,000 shares of said stock. The dividend of $30,000.00 (thirty thousand dollars)
has been transferred to the IOLTA Trust Account of Ryan, Swanson & Cleveland,
PLLC pending negotiations on the repurchase of said stock. Questions may be
directed to Brian Kreger at 206-654-2228.

Sincerely,

Jeffrey A. Hansen
Chief Financial Officer

Cc: Kurt S. Moylan
    Brian Kreger

EXHIBIT ___L___



Julale Center, Suite 107
424 West O'Brien Drive
Hagåtña, Guam 96910
Phone: (671) 472-3610/14
Facsimile: (671) 472-3615

12 May 2003

Mr. Ken Lanyon
Chief Investment Officer
American-Amicable Insurance Company of Texas
P.O. Box 2549
Waco, Texas 76702

Dear Mr. Lanyon,

It may be beneficial if you are made aware of some background information regarding events that occurred prior to my discussions with Ms. Jeanne Plessinger of Thoma Cressey, in order to provide a context for the issues you raised in your letter of 7 April 2003. About two years ago, I was named Chief Financial Officer of NetCare. At the time of my employment, Senior Management of the Company, including the former Chief Financial Officer, expressed concern over the excess valuation of the NetCor Preferred Shares of stock held by Occidental Life Insurance Company of North Carolina.

On arrival at NetCare, I began to review all significant transactions of the Company since the Company was formed. One of the most noteworthy events in the Company's history was the assumption of the block of business from Occidental. It became obvious early on that there were numerous disparities relating to the financial aspects of the Occidental book of business, including actuarial valuation, system conversion, and most importantly, the quality of the assumed block of business itself, which had been used as the material basis for the initial value placed on the NetCor stock. When it was determined that the value of the stock was grossly overstated, as it relates to the true value of the Occidental/NetCor transaction, Kurt Moylan, the President and Chief Executive Officer of both NetCare and NetCor, initiated amicable discussions with Lanny Peavy of Occidental to see if a revaluation of the stock could be agreed upon and restated for purposes of the Transfer and Assumption Agreement. During these discussions, which occurred prior to the September 30, 2001 redemption due date, Mr. Moylan informed Mr. Peavy, that NetCor would not be redeeming the 5,000 shares as scheduled for various reasons outlined by Mr. Moylan.

Discussions between Messrs. Moylan and Peavy continued through early May 2002. At that time Mr. Peavy informed Mr. Moylan that he had discussed the situation with Carl Thoma and Charles Cooper and suggested that we continue our negotiations with Mr.

EXHIBIT $M$

Cooper. Through conversations with Mr. Cooper, we were directed to continue further discussions with Jeanne Plessinger of Thoma Cressey in their San Francisco office.

Ms. Plessinger and I met in her offices on 28 June 2002 to discuss the value of the shares of the NetCor Preferred Stock. During that meeting, I outlined the several bases for our determination that the value of the NetCor shares had been vastly overstated, including the Actuarial Valuation issues that had turned up during NetCare's audit review of the whole book of business, performed approximately a year after the Assumption Agreement had been signed. I also discussed the systems conversion issues and the problems associated with it, not the least of which was the make-up of the Occidental conversion team, their methods of furnishing data to the software vendor for conversion of the Occidental policies, and the unusual conversion criteria they had developed. I explained to Ms. Plessinger the excessive number of policies that had been converted and were being held artificially in-force by that criteria. I described the number of policies that had been converted as Extended Term and Paid-Up Life that should not have been included in the portfolio transferred to NetCare in the first place. Finally, we also discussed the fact that Occidental recognizes a reduced value of the NetCor Preferred Stock shares and was carrying that investment on their books at the reduced market value of $1,000,000. This is shown in Occidental's Annual Statement, which is verified by independent accountants and certified, under oath, by Occidental's officers.

As mentioned above, this correspondence is intended to address the issues you raised in your 7 April 2003 letter, but it does not offer any absolute solution or demand at this time. We are however, asking that you once again review the Assumption Agreement, the conversion inconsistencies and the Occidental policies which were ceded to NetCare in error, and work with us to determine a fair and equitable value of the NetCor Preferred Stock in question. We hope to avoid seeking legal remedy in resolving this matter, but will do so if there appears to be no other option available to us.

I look forward to hearing from you and discussing this matter further.

Sincerely,

Jeffrey Q. Hansen
Chief Financial Officer